[No. D055585. Fourth Dist., Div. One. Feb. 17, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
STACEY RUDELL DEJOURNEY, Defendant and Appellant.

Counsel

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Gil Gonzalez and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**HUFFMAN, Acting P. J.**—A jury convicted Stacey Rudell Dejourney of forcible rape (Pen. Code,[1] § 261, subd. (a)(2); count 1) and kidnapping (§ 207, subd. (a); count 3).[2] In a bifurcated proceeding, the trial court found true that Dejourney had previously been convicted of a prior serious felony, which also constituted a strike under the "Three Strikes" law and for which he also had served a prior prison term. (§§ 667, subds. (a) & (b)–(i), 667.5, subd. (b), 1170.12.) The court sentenced Dejourney to prison for a total term of 21 years.[3]

Dejourney appeals, contending the trial court prejudicially abused its discretion and violated his due process rights in admitting evidence of uncharged sexual acts under Evidence Code section 1108 and also in admitting expert testimony regarding a complaining witness's cognitive disability. He also asserts there was no substantial evidence to support his count 3 kidnapping conviction. We affirm the judgment as modified.

### FACTUAL BACKGROUND

On August 7, 2008, with the help of strangers, 20-year-old Krystina C. called 911 to report that she had just been raped in a dumpster area near some

---

[1] All statutory references are to the Penal Code unless otherwise specified.

[2] The jury found Dejourney not guilty of the count 2 charged foreign object rape.

[3] As part of Dejourney's sentence, the court imposed and then stayed the one-year punishment for his prison prior enhancement. Because such punishment should have been stricken rather than stayed as Dejourney received a five-year enhancement for the same prior serious felony conviction (see *People v. Jones* (1993) 5 Cal.4th 1142, 1153 [22 Cal.Rptr.2d 753, 857 P.2d 1163]; *People v. Jones* (1992) 8 Cal.App.4th 756, 758 [10 Cal.Rptr.2d 502]), the court imposed an unauthorized sentence, which is subject to correction on review (*People v. Menius* (1994) 25 Cal.App.4th 1290, 1295 [31 Cal.Rptr.2d 15]). We therefore order the punishment for such prison prior enhancement stricken and the abstract of judgment modified accordingly. (§ 1260.)

businesses by Balboa Avenue and Genesee Avenue in the Clairemont area of San Diego. When San Diego Police Officer Scott Shively responded to the call and contacted her, he noted that Krystina was extremely upset, had dirt on her knees and the back of her shirt, and wanted to call her husband, who she said worked at a nearby Albertson's. After taking her initial statement of what had happened that night, Shively transported Krystina to a facility for a SART (sexual assault response team) examination. While waiting for the exam, Krystina became withdrawn, started rocking in her chair, yelled out that she was "an ugly duckling," urinated all over herself as she sat there and was inconsolable.

A SART nurse examined Krystina, finding small abrasions on her knees, dirt and debris on her external genitalia, and a large area of redness and swelling at the sides of the external genitalia, indicative of an abrasion, and determined that the results of her tests were consistent with the sexual assault history Krystina had provided. Shively then talked further with Krystina to piece together a report that he forwarded to a sex crimes detective. Shively, accompanied by Krystina, then went back and examined the dumpster area to gather additional evidence. Shively found the dumpster area very dirty and he estimated it was approximately 270 feet from the Boston Market where Krystina said she had originally asked for help to call 911 before the man allegedly directed her to the dumpster area and raped her. The next day, San Diego Police Detective Gregory Flood interviewed Krystina again.

Essentially, Krystina, who had recently moved to San Diego from Arizona with her husband, told the 911 operator, Shively and Flood that on August 7, 2008, while she was traveling on the trolley to downtown San Diego for a doctor's appointment, she learned that she needed a disabled person's ID card with her bus pass. Consequently, after her doctor's appointment, she walked to the transit store on 1st Avenue and Broadway to obtain the necessary card. However, when she arrived at the transit store it was closed, and a man sitting on a nearby bus bench began talking to her. At some point she asked him about hailing a taxicab and approached an occupied one that had stopped nearby to obtain a card with a telephone number to call them later. She then went across the street to an ATM to withdraw some money to add to the $30 she had, because she thought she would need it for a cab.[4]

After Krystina obtained the money, she began walking toward some stores she wanted to shop in before heading home. She told the 911 operator that the next thing she knew, the man came up behind her "and he just started dragging me around the downtown and he tried taking me in little dark spaces and touching me and kissing on me and stuff and he had some kind of drugs with him that he was smoking; and . . . once people kept seeing us he

---

[4] The ATM receipt Krystina received for the transaction showed the time as 6:50 p.m.

just took us on the trolley. He took all of my money and he took us on the trolley and then took us on a bus and got off at Balboa at my request [because] my husband works . . . at the Albertson's on Balboa and Mt. Abernathy, and I was gonna try and run to the Albertson's but I couldn't see it anywhere's and he didn't wanna wait on me so ah, he just drug me into this little trash can area and he just took off our clothes and he raped me. And I . . . asked him several times to please stop, I did, and he asked me why and I told him I didn't like it." In response to questions, Krystina said the man who had done this to her was African-American, about 40 years old, had his hair in a ponytail, was carrying a leather jacket with fur, had on dark clothing, and looked homeless.

When Shively arrived to assist Krystina, she filled in other details concerning her ordeal that day, including the fact that she had gone into the Boston Market near Balboa Avenue to find out where the Albertson's was located so she could find her husband and also the fact she had asked the cashier there to call 911 before the man entered the restaurant and she left with him. A videotape was obtained from the Boston Market that showed what Krystina had described. As already noted, Krystina also provided more details regarding the incidents to Flood. Additionally the next day, Dale Chock, who had read a news story online about the incident, called the police to report his observations of Krystina and the man he had seen on the bus with her from Fashion Valley to the Clairemont area on the evening of August 7, 2008. Chock told the police that he had been facing the couple who sat together on the bus near him, that the man had glared at him, and that the man had his arm around Krystina, who had no facial expressions while the man rubbed her arm and pulled her close to him.

When Dejourney was arrested on August 9, 2008, in Oceanside, California, the police found that he was wearing the same jacket described by Krystina and viewed in the Boston Market video and that he was in possession of a glass smoking pipe consistent with a device used to smoke crack cocaine and with the pipe described by Krystina as having been used by the man who had raped her. When Chock was asked to view a live lineup, he selected Dejourney as the man he had seen on the bus with Krystina. Krystina was also separately shown the lineup.

Dejourney was subsequently charged with various crimes, including rape and kidnapping, stemming from the events involving Krystina on August 7, 2008. After various pretrial motions, he proceeded to jury trial on the rape, kidnapping and a rape by foreign object charge.

*The Prosecution Case*

In addition to the above evidence, which was introduced through the testimony of Shively, Flood, the SART examiner and Chock, and the playing of the 911 taped call by Krystina and the video from Boston Market, Krystina testified, providing further details of her ordeal as well as her disabilities. Krystina explained that because she suffers from cerebral palsy, a physical, developmental, and cognitive or mental disability, she often uses a wheelchair, but can walk on her own on some days even though her legs will stiffen and become jerky and painful. Cognitively, she has difficulty with mathematics and following directions. Although she had attended special education classes in school, she had not graduated from high school and was not employable. In Arizona, she had been declared incompetent, had a guardian, and had lived in group homes. She was currently taking psychotropic, pain, antiseizure, thyroid and cerebral palsy medications.

In discussing the events leading up to the rape, Krystina explained that after she had obtained the money from the ATM on August 7, 2008, Dejourney had approached her, asking if she had a boyfriend. When she replied that she was married and he told her that her husband might be cheating on her, Krystina immediately became fearful of him. When she rejected his suggestion about her husband, Dejourney put his arm around her shoulders and started walking her at a pace she could not control, to a secluded area on the west side of the civic center. When she asked him if he would let her go if she gave him her money, Dejourney told her he would. However, when she gave him the $70 in her possession, he kept it and did not release her. Rather, while seated on a step or ledge, Dejourney removed a white substance from his sock, smoked it in a pipe, and then kissed Krystina, and touched her vaginal area and breasts, making her more anxious. She did not respond or call out to people in the area because she was too scared.

Although Krystina was struggling to remember everything, she recalled that Dejourney next took her to a more secluded location on the other side of the civic center where, behind a small wall, he bent her over, took off her underwear and slapped his penis against her buttocks.[5] She did not try to leave because she was fearful that Dejourney would harm her. Afterwards, he dragged her to the trolley stop where they rode several trolleys to Fashion Valley and then got on a bus. On the bus, Dejourney had his arm around her shoulders and when she heard the driver call out street names she recognized, she tried to look around, but Dejourney stopped her by pulling her close to him. They got off the bus at Balboa Avenue and Genesee Avenue, when Krystina told Dejourney she needed to go to the Albertson's on Balboa

---

[5] Krystina had told Flood that at this second location, Dejourney had also inserted his fingers in her vagina. However, she did not repeat this during her trial testimony.

Avenue. She entered the nearby Boston Market and asked the female cashier for directions to Albertson's. After the cashier gave her directions, Krystina whispered for her to call 911. When the cashier asked her why she wanted her to make the call and Krystina saw Dejourney enter the store, she told the cashier never mind and left the store with Dejourney following behind her.[6]

Once outside, Dejourney put his arm around Krystina's shoulder and walked at a fast pace that she could not control, essentially dragging her to a fenced dumpster area behind the businesses. There he opened the gate and closed it after they entered, placed his coat on the ground and told her to get down. When she got on her hands and knees, he touched his penis to her genital area from behind her, and entered her vagina. He then told her to get on her back and when she complied, he got on top of her, and entered her again. Krystina whimpered and cried, and begged Dejourney not to do it, but he told her to "shut the fuck up" and to call him "daddy." After he stopped, got up and told her they had to go, she followed him out of the dumpster area. However, when he turned and walked one way, she turned and walked the other way, yelling to people for help. She eventually found some people at a nearby bank who assisted her in calling 911.

*Expert Testimony*

The prosecution also called Deborah Davies, a training consultant, coordinator, and forensic interviewer with Palomar Medical Center in Escondido and The Children's Advocacy Center in Pomona, who testified as an expert witness on developmental disabilities. Davies described developmental disability as an umbrella diagnosis encompassing many conditions, but primarily involving a substantially handicapping condition. She explained that developmental disability will usually involve some degree of intellectual disability as well as significant limitations in two to three areas of adaptive functioning and that common developmental disabilities include cerebral palsy.

When asked a hypothetical as to why a 20-year-old woman with cerebral palsy, who described herself as slow and mentally retarded, and had been institutionalized multiple times, placed in group homes, declared incompetent and given a guardian, would not seek assistance in response to a perceived threat, Davies opined that such a developmentally disabled person is frequently socialized from an early age to be compliant, passive, and acquiescent to perceived authority figures (i.e., to go along with the person in charge); may not have learned self-protective skills and, even if taught such

---

[6] The cashier also testified about the encounter with Krystina in the Boston Market, describing her as appearing to be shocked, scared and worried, and confirming what she had said during the encounter. The copy of the store video played for the jury depicting the interchange showed that it occurred at 8:25 p.m.

skills, will often have difficulty applying such lessons in the real world, and have difficulty managing her emotions, leading to confusion.

*Other Crimes Evidence*

The prosecution also presented evidence that Dejourney had sexually assaulted another woman in 2001. Betty L. testified that on August 15, 2001, she was approached by Dejourney at a homeless daycare center where she had gone after just moving to San Diego. Later that day, he approached her again at another homeless facility. When she left the facility to apply for food stamps, he accompanied her and at some point told her about an abandoned house where he stayed. When he invited her to share the house, she agreed because she was sleeping on the streets at the time. On the way there, Dejourney purchased alcohol.

When they arrived at the abandoned house, Betty accompanied Dejourney to a room on the second floor where they drank and she went to sleep. When he later woke her by poking her, she told him she was tired and to leave her alone. When he woke her a second time, he was naked. Despite telling him no, Dejourney then orally copulated Betty. When he demanded she recipro- cate, pushing her head to his penis and threatening to throw her out the second floor window, she complied. While doing so, Dejourney slapped her and demanded she do it harder. When he ejaculated in her mouth, she vomited. Dejourney then held Betty on the floor and had intercourse with her. She was finally able to escape from Dejourney when another person entered the abandoned house and called out to see who was there.

*Defense Case*

With regard to the earlier sexual acts involving Betty, the defense presented testimony from a San Diego Police Department criminalist who had exam- ined Betty's clothing, sexual assault kit, and swabs from vomit at the scene, and had found no semen or sperm. Another criminalist who had conducted a DNA test on a penile swab taken from Dejourney in conjunction with the assault on Betty testified that he had found a mixture of DNA, which was consistent with both Dejourney and Betty.

Defense counsel argued that not only was there no physical evidence to show that the 2001 sexual acts occurred as Betty had testified, there was insufficient evidence to show that Dejourney committed any of the charged sexual acts against Krystina or that she had been forced to do anything or to go anywhere with him. The jury found otherwise with regard to the count 1 rape and the count 3 kidnapping charges.

## DISCUSSION

### I

### *OTHER SEX CRIMES*

In limine, defense counsel and the prosecutor filed opposing motions regarding the admission of the evidence of the sexual assault against Betty. In addition to asserting a violation of the discovery requirement for the admission of other sex crimes evidence under Evidence Code section 1108, defense counsel claimed the evidence was irrelevant and its prejudicial effect outweighed any claimed probative value.

At the hearing on the matter, defense counsel first complained that any other sex crimes evidence should be precluded because the prosecutor had provided him with the materials regarding the evidence only the week before trial and not "at least 30 days before trial" as required under section 1054.7. Counsel explained that even though he had the probation report identifying the other sex crimes, he had not received the proper notice that the prosecution would be seeking to admit such evidence at trial and therefore counsel did not believe he had sufficient time to review the matter. Counsel thought the appropriate remedy would be exclusion of the evidence, as he did not think a continuance would be sufficient because Dejourney was unwilling to waive time.

The prosecutor disagreed, explaining that the defense had the probation report, which discussed the prior sexual acts for at least eight months, that the whereabouts of the Evidence Code section 1108 victim/witness were unknown until shortly before trial, and that as soon as the victim became available as a witness, discovery was then provided. The prosecutor further noted that at that time she had talked about the matter with defense counsel, who said he might need a continuance but at least wanted the two lab reports from that earlier case. The prosecutor had provided those reports and also had located the lab personnel who prepared them and represented they would be available to assist counsel with whatever he needed for this case.

The court was not inclined to grant the defense request for the severe sanction of excluding the prior 2001 sexual acts evidence, but was willing to give Dejourney and defense counsel time to review the evidence either by trailing the matter a few days or continuing it. However, before taking a break to allow counsel to talk with Dejourney about that issue, the court turned to the Evidence Code section 352 analysis of the other sex crimes evidence. After hearing argument on the matter, the court explained that the issue was essentially whether what occurred in 2001 was similar enough to

this current case "to really provide the jury with some appropriate information that they can find . . . useful in making the determination in this case." In finding that they were similar enough to be probative, the trial judge stated: "In the underlying 2001 case, we're dealing with a transient who the defendant befriends and ultimately convinces her to go with him to this one location so she can achieve some degree of housing. In the case at hand, it appears that the defendant—although there's not a friendship that develops, certainly . . . the defendant makes contact with the victim, who is apparently looking—needs transportation and thought that she had a transient [pass] and did not, and she's in kind of a tense situation. The defendant tries to make contact with her and wants . . . to know if she wants to have a date. So he certainly tries to develop some type of relationship with the victim and begins to follow her. And ultimately the behaviors occur, including the . . . alleged rape. . . . But from the standpoint of the fact that these are two women that ultimately have contact with the defendant and they initially are strangers to the defendant, I think there is enough similarity to support the admission of this evidence."

The court then found the 2001 case was not too remote from the current 2008 case because Dejourney had ultimately been convicted in 2002 in the prior case and imprisoned for a period of time. The court also found there was no likelihood of the jury being misled or confused by the earlier sex crime's evidence, that it was no more inflammatory than the instant offenses, and there was no possibility the jury would try to punish Dejourney for the prior acts because he had been convicted. Accordingly, the court stated that under an Evidence Code section 352 analysis, "the People should be allowed to present that uncharged evidence to the jury."

After a break for defense counsel to confer with Dejourney on how he wanted to proceed, counsel stated, "we've decided to go forward with the jury trial the way it is. In discussing the matter with [Dejourney], I believe I can do an adequate cross-examination based upon [the prosecutor] making available the forensics people, if needed."

The court accepted defense counsel's representation, admonishing the prosecutor to provide defense counsel with all information regarding the matter, and clarifying that as to the Evidence Code section 1108 evidence, it had reviewed the allegations and behaviors Dejourney was alleged to have engaged in with both victims before doing its Evidence Code section 352 analysis. It found the sexual conduct engaged in with each victim was similar in nature and that Dejourney's behavior was similarly aggressive and threatening in both cases.

During trial, after Krystina had testified, defense counsel again raised the issue of the admissibility of the prior sexual assault evidence against Betty

under Evidence Code section 1108, specifically relying upon the case of *People v. Harris* (1998) 60 Cal.App.4th 727 [70 Cal.Rptr.2d 689] (*Harris*) to support the exclusion of the evidence. Counsel thought because the focus in this case was on whether Dejourney had taken advantage of a developmentally disabled person and the alleged prior sexual acts involved violence via threats and actual slapping and punching, which was absent from this case, that the evidence should be excluded as irrelevant and too inflammatory. Counsel also believed it would take an undue consumption of time to present the earlier evidence because Dejourney had not pled guilty to rape or forced oral copulation, but had only pled guilty under *People v. West* (1970) 3 Cal.3d 595 [91 Cal.Rptr. 385, 477 P.2d 409] to a sexual assault. Counsel further thought that the prior case was remote and "defensible" based upon the scientific evidence from eight years ago, and that its admission would be confusing and highly prejudicial.

The prosecutor pointed out that the facts in *Harris, supra*, 60 Cal.App.4th 727, regarding the other sex crimes evidence were extreme and clearly more inflammatory than in the case before that jury and unlike those in this case. The prosecutor argued the similarity of the particular vulnerability of the victim here and in Dejourney's prior case, as well as the facts there was a plea in the earlier case to an assault to commit rape and there was no remoteness issue such as the 23 years in *Harris*, only the lack of a trouble-free life between 2001 and 2008 for Dejourney, outweighed any prejudice from the extremely legitimate proffer of the propensity evidence that Evidence Code section 1108 allows.

The court again ruled the evidence of other sex crimes was admissible. In doing so, the court noted the importance of the issue and the thorough examination it had conducted in completing the Evidence Code section 352 analysis. It stated it had rereviewed the case law and the prosecutor's proffer of the Evidence Code section 1108 evidence, specifically noting the facts of the earlier incident and comparing them with the facts of the ordeal it had just heard from Krystina as well as the investigating detective. The court again found that both cases had vulnerable victims whom Dejourney had taken advantage of by attempting to befriend and help so that he could eventually sexually prey on them. The court further found both incidents were inflammatory, and even though the prior had some direct violence, which was a factual inconsistency from the present case and might make it slightly more inflammatory, that distinction would not preclude it from being admissible under *People v. Falsetta* (1999) 21 Cal.4th 903 [89 Cal.Rptr.2d 847, 986 P.2d 182] (*Falsetta*). The court found the aggressive conduct by Dejourney, while raping and sodomizing the victim in this case as she whimpered in a secluded, dirty garbage enclosure, very disturbing and not that much different than conduct in the 2001 case.

The court additionally found the probative value of the other sex crimes to show Dejourney's propensity to commit such offenses was great because the jury needed to decide what was his motive, desire, or belief regarding whether there was a relationship with Krystina such that she was interested in him and whether the acts were consensual. The court was not persuaded that the inflammatory nature and the inconsistencies unduly weighed in favor of the defense to exclude the evidence. The court again noted it did not find the prior incident in 2001 remote because Dejourney had been in prison several years between the commission of those offenses and the present ones. The trial judge concluded that "after, once again, careful analysis and review of the statute, review of the cases, review of *Harris*[, *supra*, 60 Cal.App.4th 727], I do believe that, as proffered, by virtue of the People's trial brief . . . I'm going to allow it." Betty subsequently testified as noted in the factual background above.

On appeal, Dejourney contends the trial court prejudicially abused its discretion and violated his due process rights to a fair trial by admitting evidence of his prior sexual assault on Betty under Evidence Code section 1108. We disagree.

## A. *Pertinent Law*

Subject to Evidence Code section 352, Evidence Code section 1108 permits a jury to consider prior incidents of sexual misconduct for the purpose of showing a defendant's propensity to commit offenses of the same type and essentially permits such evidence to be used in determining whether the defendant is guilty of a current sexual offense charge. (Evid. Code, § 1108, subd. (a).)[7] Although before Evidence Code section 1108 was enacted, prior bad acts were inadmissible when their sole relevance was to prove a defendant's propensity to engage in criminal conduct (see Evid. Code, § 1101[8]; *Falsetta, supra,* 21 Cal.4th 903, 911, 913), its enactment created a statutory exception to the rule against the use of propensity evidence,

[7] Evidence Code section 1108, subdivision (a), provides that "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code] Section 1101, if the evidence is not inadmissible pursuant to [Evidence Code] Section 352." This section allows admission, in a criminal action in which the defendant is accused of one of a list of sexual offenses, of evidence of the defendant's commission of another listed sexual offense that would otherwise be made inadmissible by Evidence Code section 1101, subdivision (a). The prior and charged offenses are considered sufficiently similar if they are both sexual offenses enumerated in Evidence Code section 1108, subdivision (d)(1)(A) through (F). (*People v. Frazier* (2001) 89 Cal.App.4th 30, 41 [107 Cal.Rptr.2d 100] (*Frazier*).)

[8] Evidence Code section 1101 provides in relevant part: "(a) Except as provided in this section and in [Evidence Code] Section[] . . . 1108 . . . , evidence of a person's character or trait of his . . . character (whether in the form of . . . evidence of specific instances of his . . . conduct) is inadmissible when offered to prove his . . . conduct on a specified occasion. [¶]

allowing admission of evidence of other sexual offenses in cases charging such conduct to prove the defendant's disposition to commit the charged offense (21 Cal.4th at p. 911). The California Supreme Court has ruled that Evidence Code section 1108 is constitutional and does not violate a defendant's due process rights. (21 Cal.4th at pp. 910–922.)

■ However, because Evidence Code section 1108 conditions the introduction of uncharged sexual misconduct or offense evidence on whether it is admissible under Evidence Code section 352,[9] any objection to such evidence, as well as any derivative due process assertion, necessarily depends on whether the trial court sufficiently and properly evaluated the proffered evidence under that section. "A careful weighing of prejudice against probative value under [Evidence Code section 352] is essential to protect a defendant's due process right to a fundamentally fair trial. [Citations.]" (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314 [97 Cal.Rptr.2d 727] (*Jennings*).) As our Supreme Court stated in *Falsetta*, in balancing such Evidence Code section 1108 evidence under Evidence Code section 352, "trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other . . . offenses, or excluding irrelevant though inflammatory details surrounding the offense. [Citations.]" (*Falsetta, supra,* 21 Cal.4th at p. 917.) In evaluating such evidence, the court must determine "whether '[t]he testimony describing defendant's uncharged acts . . . was no stronger and no more inflammatory than the testimony concerning the charged offenses.' " (*Harris, supra,* 60 Cal.App.4th 727, 738.)

■ On appeal, we review the admission of other acts or crimes evidence under Evidence Code section 1108 for an abuse of the trial court's discretion. (*Kipp, supra,* 18 Cal.4th at p. 371.) The determination as to whether the

(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his . . . disposition to commit such an act."

To be relevant on the issue of intent, uncharged crimes need only be sufficiently similar to a charged offense to support the inference that the defendant probably harbored the same intent in each instance. (*People v. Kipp* (1998) 18 Cal.4th 349, 371 [75 Cal.Rptr.2d 716, 956 P.2d 1169] (*Kipp*).)

[9] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

probative value of such evidence is substantially outweighed by the possibility of undue consumption of time, unfair prejudice or misleading the jury is "entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence." (*People v. Fitch* (1997) 55 Cal.App.4th 172, 183 [63 Cal.Rptr.2d 753].) The weighing process under section 352 "depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules." (*Jennings, supra,* 81 Cal.App.4th at p. 1314.) " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 320 [75 Cal.Rptr.2d 412, 956 P.2d 374].) We will not find that a court abuses its discretion in admitting such other sexual acts evidence unless its ruling " 'falls outside the bounds of reason.' [Citation.]" (*Kipp, supra,* 18 Cal.4th at p. 371.) In other words, we will disturb a trial court's ruling under Evidence Code section 352 only where the court has exercised its discretion in a manner that resulted in a miscarriage of justice. (*Frazier, supra,* 89 Cal.App.4th at p. 42.)

## B.   *Analysis*

Here, the record affirmatively reflects the trial court carefully considered Dejourney's prior conduct and conviction, its nature and similarity to the charged offenses, and weighed its prejudice against its probative value, finding in the end that its prejudicial effect was outweighed by its probative value. Essentially, the court found the prior sexual acts evidence to be the precise type of evidence anticipated by the Legislature in enacting Evidence Code section 1108, that it revealed conduct which, though appearing to be slightly more inflammatory than the conduct for which the defendant was currently on trial, was not more prejudicial considering the circumstances of the instant case (see *Harris, supra,* 60 Cal.App.4th at pp. 737–738) and it was highly probative as propensity evidence (see *People v. Waples* (2000) 79 Cal.App.4th 1389, 1392–1395 [95 Cal.Rptr.2d 45]).

Although the earlier conduct was similar to the conduct in the current case, it was not identical. Dejourney had previously been convicted based on his plea of a sexual assault for attempting to forcibly rape and orally copulate a homeless woman with whom he had tried to establish a relationship, while here he was alleged to have forcibly raped and kidnapped a woman who suffered from cerebral palsy and its related physical and mental challenges and with whom he attempted to strike up a conversation to establish at least a minimal relationship. In both situations, Dejourney had exploited the vulnerabilities of his victim and had committed similar sex offenses. The court

spent considerable time reviewing the facts of the proffered evidence and those in the current case in light of the pertinent law and the authorities relied upon by the parties and again revisited the matter after the victim here had testified. The court aptly observed the similarities shared by the two cases, correctly dismissed any potential remoteness between the 2001 and 2008 acts during which Dejourney had spent much time in prison, explained how this case was more like *Falsetta, supra*, 21 Cal.4th 903 than *Harris, supra*, 60 Cal.App.4th 737, upon which Dejourney relied, correctly observed there was nothing about the two offenses which would cause the jury confusion or mislead it in any manner, because the evidence of each came from independent sources, and appropriately determined that any seemingly inflammatory effect involved in the prior conduct was not unduly prejudicial. On this record, we cannot find that the trial court abused its discretion in weighing the proposed evidence under Evidence Code section 352 and admitting it under Evidence Code section 1108. Accordingly, Dejourney's due process claim premised upon such an error is also without merit. (See *People v. Lewis* (2009) 46 Cal.4th 1255, 1289 [96 Cal.Rptr.3d 512, 210 P.3d 1119].)

To the extent Dejourney is additionally claiming a discovery violation with regard to the Evidence Code section 1108 evidence, such claim fails. Not only has he not properly presented the issue with argument or authority to support a claim of error (see *People v. Gionis* (1995) 9 Cal.4th 1196, 1214, fn. 11 [40 Cal.Rptr.2d 456, 892 P.2d 1199]), the record clearly shows he declined to accept the trial court's proposed remedy for such violation below thereby forfeiting any right to raise it before this court. No evidentiary error regarding the other sex crimes evidence is shown.

II

*EXPERT TESTIMONY*

In limine, the People also brought a motion to admit Davies's expert testimony about behavior patterns that are common with individuals who are developmentally delayed and then subjected to a violent sexual act. Although the trial court had no problem with an expert testifying about such subject matter, the court was unclear as to whether there was a factual basis for the jury finding Krystina to be such a developmentally delayed or disabled individual. The court explained that once it was determined that Krystina was low functioning or developmentally delayed, then it might be appropriate to allow the expert to testify. However, at that point the court was uncertain whether Krystina herself could provide such evidence by testifying that she was such a person.

The prosecutor represented that Krystina would both display and describe her own developmental disability, which the prosecutor thought would be

sufficient, as there was no charge that Dejourney had committed a sexual assault of a disabled person for which the People would have the burden of proving her disability. After talking to Davies, the prosecutor understood "developmental delay" not to be a "diagnosis per se," but rather "an umbrella term" to describe a large range "of illnesses, conditions, syndromes that would result in a person being delayed, slow, [or] retarded." The prosecutor thought that Davies would be able to discuss, in light of her training and practical experience, the "lower ability to process, to read danger, to acknowledge, understand what's going on [with a person like Krystina, and how it is] very easy to take advantage of that person and to order them around if one is so inclined." The prosecutor maintained that Davies would testify to matters not "within the common person's understanding" and that she would not give any opinions on guilt or consent.

When defense counsel again questioned whether Krystina's testimony alone was an adequate foundation for the expert testimony and asserted that Davies's proposed testimony would invade the jury's responsibility to make a determination on consent, which was an ultimate issue in the case, the court agreed that Davies, if permitted to testify, could not opine as to whether Krystina had consented. The court noted, however, that before a final determination regarding the issue could be reached, the prosecution would need to show "either through the victim or through somebody else" that Krystina was "within a category that the expert can provide opinion testimony on" such as having a "substantial cognitive impairment." Until that time, the court directed counsel not to mention anything about expert witness testimony in opening statements and reserved ruling until after Krystina testified and it could conduct an Evidence Code section 402 hearing to get a sense of what the expert would say.

During the course of Krystina's testimony, in which she described her various cognitive and physical disabilities due to her cerebral palsy condition as well as how they impacted her daily living, the trial judge observed, while taking a break, that "there is an intellectual issue that is apparent to me," and that Krystina was obviously having difficulty standing up to the rigors of examination besides not understanding some of the words used in questioning her. When the prosecutor asked the court whether it thought there had been a sufficient foundation laid through Krystina's testimony at that point for purposes of admitting the expert testimony or whether the prosecutor needed to ask further questions in that direction or to bring in another expert on her condition, the court responded that although it would be more comfortable having an expert testify about her condition, that Krystina had done so and that the real question in the Evidence Code section 402 hearing would be what could the expert say based on the information described by Krystina.

When the prosecutor then represented that Davies was comfortable opining on how a developmentally disabled person would act based on Krystina's limited description of her own condition in her testimony thus far, the court thought "that may be okay," but wanted to reserve ruling until hearing from Davies at the evidentiary hearing. Because the court wanted to be sure the jury would not be "confused that the testimony of the expert [was] somehow demonstrating that [Dejourney] should have made greater inquiry" on the issue of consent, the court wanted defense counsel to have the opportunity to question the expert and "see where it goes."

Before the Evidence Code section 402 hearing with Davies, the court tentatively noted that if her testimony were "very focused and isolated" to the area of delayed development of a person similar to that which Krystina had described of herself in her testimony, and to how such a person would react with regard to certain conduct, especially why the person would not do something given the proximity of people in and around the person, then it would probably be "open to that" because "there may be a need to explain that," but not much beyond that.

During the hearing, after describing her education and background in general and then specifically in dealing with developmentally disabled individuals, the prosecutor posed several hypotheticals to Davies using the facts in evidence and asking whether she could assess a developmentally disabled person's vulnerability and the risk that the person would have for sexual assault. In sustaining defense counsel's objections that the question was compound and going toward the ultimate conclusion of guilt, the court explained that it would not allow Davies to testify about vulnerability or consent, but rather would permit "a question more along the lines of, hypothetically, situations where individuals . . . similar to the victim in this case . . . when they are experiencing a danger or what they perceive as some inappropriate contact, that they respond consistent with how this victim in this case responded. That being not seek[ing] the assistance of anyone . . . , including law enforcement, until the person is no longer in close proximity." The court reminded the prosecutor that she needed to stay away from consent and "what was going on in [Dejourney's] decision to act the way he acted . . ." and focus on "explaining to a jury why somebody who might be confronted with danger or . . . with what she perceived as danger at the hands of a stranger would not take action, such as contacting the police or contacting nearby individuals, why that might not occur given this type of person." The court found this area the only one that might be relevant.

After Davies then responded to a hypothetical drawn from the evidence in this case, identifying several factors that would explain why a developmentally delayed person as described by Krystina would fail to seek available

assistance when another person is directing him or her in a matter not in the person's best interest or the individual perceives she is in danger, the court again noted in response to a defense objection that Davies's opinion testimony would necessarily be very limited to that one area. When the court then noted that the evidence adequately established that Krystina was developmentally disabled and was in fear of Dejourney, and the question to Davies would be why a person in that situation would not take any action, defense counsel agreed, stating the questioning must be limited to that. The prosecutor concurred, explaining that was the only area on which she intended to question Davies.

After further discussion on how careful the prosecutor needed to be to stay away from the consent issue and limit the questioning to only why a person might stay with an individual who was perceived as a threat, defense counsel objected to the lack of a foundation regarding Davies's knowledge as to mentally disabled persons, i.e., what scientific literature she consulted or any experiences she had on this issue. After Davies then outlined the literature she had consulted regarding individuals with developmental disabilities, noted her experience and training as a forensic interviewer in the subject area at three facilities, and was cross-examined about her experience and education regarding the limited area, defense counsel argued that Davies was not qualified to testify as an expert because she had never before testified regarding this specific area. Counsel additionally thought that the subject area could not be narrowly tailored enough for this case to qualify Davies's testimony.

The court ruled that Davies would be allowed to testify as an expert as to why people with disabilities were compliant with authority and why, when faced with an emergency, they may not be able to put into effect how they have been taught to deal with the emergency or perceived danger. In doing so, the court clarified that it was satisfied Davies was qualified via her education and experience to testify about mentally disabled individuals and the limited areas discussed, that such limited matter would be of assistance to the jury in understanding and assessing the evidence, and that Davies's testimony would be admitted, but limited to explaining why a person with a developmental disability would not seek available assistance when faced with an apparent threat.

As noted in the factual background above, when Davies testified before the jury, she described a developmental disability as a substantially handicapping condition causing significant limitations in two to three areas of adaptive functioning, which included cerebral palsy, and in response to a hypothetical drawn from the evidence, opined that some reasons a developmentally disabled person would not seek available assistance when faced with a threat included lifelong socialization to be compliant, passive, and acquiescent to

authority figures; the lack of, or difficulty in applying self-protection skills; and the difficulty managing emotions.

On appeal, Dejourney contends the trial court prejudicially abused its discretion and violated his constitutional due process rights to a fair trial by allowing Davies to testify as an expert on reasons why a person with developmental disabilities would not seek assistance when faced with a threat. He specifically complains that Davies's testimony was not sufficiently beyond common experience to be admitted as expert testimony and that there was no adequate foundation presented to show that her testimony was more scientifically based than that which Krystina had already provided in describing herself as a developmentally disabled person. No error is shown.

■ As a general rule expert opinion testimony is limited to an opinion that is "[r]elated to a subject that is sufficiently beyond common experience that the opinion . . . would assist the trier of fact." (Evid. Code, § 801, subd. (a).) Because admissibility of expert opinion is a question of degree, and a jury need not be wholly ignorant of the subject matter under the statutory rule, exclusion is only necessary where the opinion would add nothing at all to the jury's common fund of information. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299–1300 [283 Cal.Rptr. 382, 812 P.2d 563] (*McAlpin*).) For example, courts have repeatedly recognized the appropriate use of expert testimony when an alleged victim's actions during or following a crime seem to contradict the victim's claims in cases of alleged molestation or abuse. (See *People v. Riggs* (2008) 44 Cal.4th 248, 293 [79 Cal.Rptr.3d 648, 187 P.3d 363] [expert testimony addressing battered woman's syndrome]; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744 [32 Cal.Rptr.2d 345] [expert testimony concerning child sexual abuse accommodation syndrome].) "A trial court's decision as to whether a particular subject is a proper one for expert opinion is reviewed for abuse of discretion." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1118 [40 Cal.Rptr.3d 118, 129 P.3d 321], overruled on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151 [74 Cal.Rptr.3d 454, 180 P.3d 224].)

Here, we find no abuse of discretion in the trial court's admission of Davies's expert testimony. As the record clearly shows, the court carefully reviewed Davies's qualifications to testify regarding developmental disabilities in light of Dejourney's counsel's objection on that ground, and carefully narrowed the scope of Davies's testimony and opinion to whether there were reasons why a person with a developmental disability, as described in the evidence before the jury, would not seek assistance from third parties when faced with a perceived danger or threat. As limited, Davies's testimony was directed to the particular characteristics of persons with developmental disabilities which the court specifically found would assist the jury because

Krystina failed to seek help from the numerous people who were reasonably close by during the course of the evening's actions, which appeared to contradict her testimonial claims that she was in fear while in Dejourney's control and that she did not consent to his sexual advances.

Contrary to Dejourney's arguments that the jury was fully capable of evaluating Krystina's credibility without the expert testimony describing particular characteristics of developmentally disabled persons because there was no evidence of Krystina's IQ or actual cognitive level, only her obvious disabilities, which had been noted by the court, he cites no authority showing the characteristics of even obviously developmentally disabled individuals are so widely understood that an expert's testimony on such matter would be completely unnecessary or unhelpful in evaluating a developmentally disabled victim's testimony. Even if some jurors had experience with developmentally disabled persons, that experience would not foreclose a finding that the expert testimony could be of assistance. (*McAlpin, supra,* 53 Cal.3d at pp. 1299–1300.) Because we believe that the reactions of a developmentally disabled person to sexual advances is beyond the range of general knowledge of jurors or that the opinion of an expert on the subject could at least be helpful in evaluating the victim's testimony, we cannot find, as Dejourney claims, that Davies's testimony did not satisfy the foundational requirement for admission because it was not beyond the scope of a layperson to understand.

In sum, on this record we can find no abuse of discretion in the trial court's admission of Davies's expert testimony. Accordingly, Dejourney's due process claim premised upon such abuse of discretion similarly fails.

### III

### *SUFFICIENT EVIDENCE OF KIDNAPPING*

Near the close of the prosecution case while the parties were discussing another matter, the trial judge noted his concern about the sufficiency of the evidence to support a conviction on the count 3 kidnapping charge. The court asked the parties to address the matter when it entertained the defense motion to dismiss the charges against Dejourney at the completion of the prosecution evidence the next day. During that hearing, defense counsel essentially argued that Krystina's own testimony at trial revealed that Dejourney had never threatened her or used force to move her to any location and that there was no evidence to show she was not consenting to the various sexual acts he had committed with her. Counsel specifically referred the court to the magistrate's comments at the preliminary hearing that "the only place . . . that there may be some kidnapping is from the [Boston] Market to the dumpster," and to the

Boston Market cashier's testimony that she did not see Dejourney holding, pushing or leading Krystina in any direction after leaving the market.

The prosecutor argued that Krystina's fear of Dejourney and her lack of consent as to what was happening was cumulative throughout the entire ordeal. The prosecutor explained it was the People's position that Krystina had become fearful of Dejourney at the time he approached her after getting money at the ATM and that she became more and more fearful and anxious of him when he then led her around from place to place holding her shoulders, walking her faster than her legs could handle. Her fear intensified when Dejourney would not let her go after taking the money she had offered him to leave her alone and after he had smoked some drugs, which she understood sometimes causes a person to become violent. Because of her physical and mental limitations, that the prosecutor noted were obvious just by looking at and watching her, which Dejourney clearly had the opportunity to do, the prosecutor argued that Krystina had actual or reasonable fear of Dejourney to satisfy any element of force or fear and lack of consent for the charges. The prosecutor also noted that the video from the Boston Market showed how anxious, fearful and worried Krystina looked when she asked the cashier there to call 911 and then abandoned her attempt to get help when Dejourney walked into the market, showing just how afraid she was of his physical presence.

As for the kidnapping charge, the prosecutor essentially conceded that the crime did not occur downtown, but only from the Boston Market. The prosecutor asserted that the approximately 115 feet from the market to the dumpster area where Dejourney had walked Krystina, with his arm around her shoulder, at a pace she could not control, was substantial and that his directing her inside to a secluded area "shielded from view where nobody can see them," drastically increased the likelihood of harm to her and decreased the likelihood of detection. Once hidden from view, Dejourney ordered her to do certain things and she complied in fear for her safety and without consent, as evidenced by her whimpering and crying and his hostile yelling at her to "shut the fuck up" and to call him "daddy."

Although recognizing that Krystina's trial testimony alone was equivocal as to consent, the prosecutor noted that her statements made to the 911 operator closer to the event, as well as those made to the responding police officer and the detective, all supported a finding that Krystina did not want to go with Dejourney to the dumpster. The prosecutor specifically argued that "we have this movement to another place, from Balboa Avenue to the trash enclosure, that the victim did not want to go, that there is no way that Mr. Dejourney could actually and reasonably believe that she wanted to go inside that dumpster enclosure, that the distance was substantial, especially considering how isolated, how secluded, how hidden they became."

The court denied the section 1118.1 motion as to all counts. In doing so, the court made a lengthy record of the difficult aspect of just reading the "cold transcript [of] the testimony of the victim" in this case, because such did not do justice to what difficulty Krystina had in testifying and her entire demeanor. The court noted that she was clearly not "your run-of-the-mill adult woman" and that she clearly suffered from significant intellectual deficits and physical challenges. Because of these, the court agreed with the prosecutor that anyone having contact with her would know that she was different and not average. Although Krystina did not specifically tell Dejourney to leave her alone or to stop, the court found that it was clear from her testimony that she was not comfortable with any of the contact with Dejourney, that she wanted to give him money to get him to leave her alone, and that she was discomforted and frightened by his drug usage and the situation with him that kept building upon itself. The court thought the testimony from Chock regarding his observations of how Dejourney sat with Krystina with his arm around her shoulder, pulling her closer and molding or playing with her arm, coupled with the other evidence in the case supported the inference that Dejourney was forcing Krystina to go where "he wanted her to go and direct[ing] her and get[ting] her to comply with his desires." The court further thought that Krystina's testimony that she was trying to find her husband because he was going to help her with this situation was evidence that she was not a voluntary participant in it.

Specifically, with regard to the count 3 kidnapping, the court found that based on the entirety of the event, it was a question of fact whether there was a kidnapping from the Boston Market to the trash dumpster. Although the court thought it was a "close call," it pointed out that the evidence was clear that Krystina was in fear at that time, having asked the cashier in the Boston Market to call 911 and having gotten directions to the Albertson's so she could get help. So the evidence was that she did not want to go to the dumpster area or be with Dejourney at the time she left the Boston Market and he put his arm around her shoulder and basically took her "to the location of the trash dumpster, walking faster than she is able to walk. And that coupled with the 911 call where she says she was drug over to the trash dumpster . . . , demonstrates that she was certainly not a . . . voluntary participant in this . . . conduct. And . . . those facts demonstrate sufficient evidence to support the jury making the call whether this was indeed a kidnap."

During instructions, the court read to the jury CALCRIM No. 1215 on kidnapping, which told the jurors that in order to convict Dejourney of such crime, the prosecution had to prove that: "One, the defendant took, held or detained another by using force or by instilling reasonable fear; two, using that force or fear, the defendant moved the other person or made the other person move a substantial distance; three, the other person did not consent to

the movement; and, four, the defendant did not actually and reasonably believe the other person consented to the movement." In closing, the parties essentially argued as they had during the dismissal motion regarding the sufficiency of the evidence to support the kidnapping charge.

On appeal, Dejourney contends, as he did below, that there was insufficient evidence to support his count 3 conviction for kidnapping. He specifically argues there was no evidence that he used force or fear to move Krystina and no evidence that he reasonably believed she was unwilling to accompany him. We conclude sufficient evidence supports Dejourney's count 3 conviction.

In reviewing the sufficiency of the evidence to support a conviction, we determine " 'whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged.' [Citations.]" (*People v. Crittenden* (1994) 9 Cal.4th 83, 139, fn. 13 [36 Cal.Rptr.2d 474, 885 P.2d 887].) Under such standard, we review the facts adduced at trial in full and in the light most favorable to the judgment, drawing all inferences in support of the judgment to determine whether there is substantial direct or circumstantial evidence the defendant committed the charged crime. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496 [117 Cal.Rptr.2d 45, 40 P.3d 754]; *People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618].) The test is not whether the evidence proves guilt beyond a reasonable doubt, but whether substantial evidence, of credible and solid value, supports the jury's conclusions. (*People v. Arcega* (1982) 32 Cal.3d 504, 518 [186 Cal.Rptr. 94, 651 P.2d 338]; *In re Nathaniel C.* (1991) 228 Cal.App.3d 990, 996 [279 Cal.Rptr. 236].)

In making the determination, we do not reweigh the evidence; the credibility of witnesses and the weight to be accorded to the evidence are matters exclusively within the province of the trier of fact. (Evid. Code, § 312.) We simply consider whether " ' "*any* rational trier of fact could have found the essential elements of [the charged offenses] beyond a reasonable doubt." ' [Citation.]" (*People v. Rich* (1988) 45 Cal.3d 1036, 1081 [248 Cal.Rptr. 510, 755 P.2d 960].) Unless it is clearly shown that "on no hypothesis whatever is there sufficient substantial evidence to support the verdict" the conviction will not be reversed. (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429 [180 Cal.Rptr. 391].)

With regard to kidnapping, section 207, subdivision (a) defines the crime as: "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part

of the same county, is guilty of kidnapping." As already noted, in order to convict Dejourney of kidnapping, the prosecution had to prove that: "[O]ne, the defendant took, held or detained another by using force or by instilling reasonable fear; two, using that force or fear, the defendant moved the other person or made the other person move a substantial distance; three, the other person did not consent to the movement; and, four, the defendant did not actually and reasonably believe the other person consented to the movement." (CALCRIM No. 1215.)

Here, the evidence amply supports each of these elements of kidnapping of Krystina by Dejourney from the Boston Market to the dumpster area where she was raped. Dejourney does not dispute that there was evidence to show that the distance between the Boston Market to the dumpster of at least 115 feet was substantial. He merely contends there was no evidence he used force or fear to move Krystina to the dumpster or that she did not consent to the movement or that he did not actually believe she had consented to the movement to the dumpster.

However, as the trial court noted in ruling on the dismissal motion, the entirety of the record showed that from the time Krystina obtained money from the ATM and was approached by Dejourney as she walked toward some stores downtown, asking about her husband and guiding her with his arm around her shoulders to a place near the civic center that she was not familiar with, Krystina experienced reasonable fear. The jury could have then reasonably found that her fear continued to grow as Dejourney smoked some drugs, began making sexual advances toward her and took her to a more secluded area nearby where he continued his sexual assaults. Krystina explained in her testimony that she was "frozen inside [her] head and [she] was too scared" to call out to people who saw them during the ordeal. Although she then went with Dejourney on several trolleys and finally a bus, which the prosecutor below conceded may not have been forced because she wanted to go on the transportation lines to try to reach her husband, nonetheless, the evidence shows that Krystina remained fearful of Dejourney and appears to have gone with him only to find a place of safety.

From the evidence that he continued to hold her around her shoulders during the bus trip, pulling her closer to him when she tried to look around as if he were controlling her movements, and the fear she exhibited in Boston Market when asking the cashier to call 911 and her quietness when Dejourney entered the restaurant and left with her, with his arm again around her shoulder and moving her at a pace faster than she could walk, the jury could have reasonably inferred that Dejourney forcefully pushed Krystina beyond her capabilities to move her to the dumpster area without her consent while continuing to instill fear in her after leaving the market. The jury also could

have concluded that Krystina's statements to the 911 operator and the police detective made closer to the time of her ordeal that Dejourney had dragged her into the dumpster area were more accurate than her trial testimony, which she explained was a struggle "to fetch [her] memory."

Although Krystina testified on cross-examination that Dejourney had not made any verbal threats, as the trial court noted below, she clearly described his actions of taking control of her and instilling fear in her well beyond the minimal necessary to move her from the Boston Market to the dumpster area without her consent. (See *In re Michele D.* (2002) 29 Cal.4th 600, 606 [128 Cal.Rptr.2d 92, 59 P.3d 164].) Dejourney's claim that there is no sufficient evidence to support the element of forceful or fearful movement because Krystina "repeatedly and consistently testified that [he] did nothing and said nothing to compel her," is therefore unavailing on this record.

Moreover, because the evidence supports the jury's findings that Krystina's movements were "accomplished by force or any means of instilling fear" (*People v. Majors* (2004) 33 Cal.4th 321, 326 [14 Cal.Rptr.3d 870, 92 P.3d 360]) and without her consent (see *People v. Hill* (2000) 23 Cal.4th 853, 856 [98 Cal.Rptr.2d 254, 3 P.3d 898]), Dejourney's claim that there is no evidence he did not actually and reasonably believe Krystina consented to the movement is also unconvincing on this record. Aside from the fact that no reasonable person would have believed that grabbing strangers by the shoulders, walking with them faster than their capabilities, not leaving them alone when asked or offered money to do so was a consensual encounter even in the face of no specific verbal objection, Dejourney fails to appreciate that the jury watched Krystina testify. As the prosecutor and court both noted, her physical and mental limitations "were obvious just by looking at and watching her," a fact also testified to by Chock, who saw her on the bus with Dejourney. The jury viewing her demeanor and hearing her testify could have determined that Dejourney could not have reasonably believed that Krystina was consenting to the movement to the dumpster area from the Boston Market. Further, Krystina's crying and pleading with Dejourney to stop when he was raping her in the dumpster enclosure and his yelling at her to "shut the fuck up" and to call him "daddy," provide circumstantial evidence that she had not consented to going to the dumpster area with him and that he did not actually believe that she had done so. We do not reweigh the evidence.

In sum, there is more than sufficient evidence to support Dejourney's count 3 kidnapping conviction.

## DISPOSITION

The judgment is modified to strike rather than stay the prison prior enhancement. In all other respects, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment reflecting such modification and to forward a certified copy to the Department of Corrections and Rehabilitation.

Nares, J., and McIntyre, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 8, 2011, S191801.