Filed 8/14/15  P. v. Williams CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANDERSON WILLIAMS,<br><br>    Defendant and Appellant. | A139356<br><br>(Alameda County<br>Super. Ct. No. 170886) |

Defendant and appellant Anderson Williams (defendant) appeals following his convictions for pimping and pandering.  We affirm.

PROCEDURAL BACKGROUND

In February 2013, the Alameda County District Attorney filed an information charging defendant with human trafficking (Pen. Code, § 236.1, subd. (a);[1] count one); human trafficking for prostitution (§ 236.1, subd. (b); count two); pimping (§ 266h, subd. (a); count three); and pandering (§ 266i, subd. (a)(1); count four).

A jury found defendant not guilty on counts one and two and guilty on counts three and four.  The trial court sentenced defendant to the six-year upper term on count three and stayed the sentence on count four under section 654.

This appeal followed.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1

FACTUAL BACKGROUND

Testimony of Whitney Scott

Whitney Scott (Scott) moved from Iowa to Oakland in February 2012, when she was 19 years old. She moved to Oakland because a man she met online told her she could live with him; when she arrived he announced she would have to work for him as a prostitute or fend for herself. She worked for him for two weeks before switching to another pimp. She subsequently worked for two other pimps before meeting defendant in October 2012.

On the night of October 8, 2012, Scott was working as a prostitute in Oakland and had to walk home because her pimp failed to pick her up. Defendant approached her and they talked and walked to defendant's grandmother's house, where he was staying. She spent the night there. Scott opined it would have been obvious she was a prostitute because of the way she was dressed.

Scott's pimp "fired" her after finding out she spent the night with defendant. Scott's pimp found out because she was seen at the house by defendant's brother, who was also a pimp, and by a prostitute who worked for the brother. Defendant offered to take Scott in; he told her she needed "to work on the streets for a little bit, but not permanently." Scott gave defendant $100 that she made from prostituting for her previous pimp. She returned to regular prostitution. Scott described her relationship with defendant, testifying "I knew it was a pimp-and-prostitute relationship, but he made it feel like it wasn't, because we were doing things that pimps and hoes weren't supposed to be doing. ¶ . . . ¶ Like kissing and . . . saying I love you."

Defendant would tell Scott when to work "every day," and he told her she had to work when she did not feel like doing so. On busy nights Scott would make about $500; if she made less than $100 in a night, defendant would make her work longer the next night. While she was working, defendant called her every hour to check in on her and find out how much money she was making. Other than her clients, Scott was not permitted to speak to other men, other than defendant's brothers. She gave defendant all

the money she earned at the end of each evening. If she needed something, defendant would take her shopping.

Defendant also encouraged Scott to post ads on internet websites used by prostitutes. About a month after Scott met defendant, he sent her to Albuquerque with another prostitute, who worked for his brother. She made about $2,000, which she sent to defendant. Around Thanksgiving 2012, defendant sent Scott to Albuquerque a second time. She sent some of the money she made on that trip to defendant, but she also purchased a laptop computer with his permission; she used the laptop to post internet prostitution ads.

After a week in Albuquerque, Scott flew to see her family in Iowa on an impulse, without defendant's permission. Defendant was mad. He encouraged Scott to return to Oakland, telling her she would not have to work as a prostitute. She returned; defendant was initially affectionate, but then he slapped her for traveling to Iowa without his permission. She continued to work for defendant as a prostitute. On another occasion, he slapped her after finding her in a room with a man from whom she had purchased marijuana. He was upset because she had a man in her room who was not a customer. On a third occasion, defendant hit her after she started to get into a car that she mistakenly thought belonged to his brother.

Eventually, Scott decided to leave defendant. One night, Scott was working and a police officer came up to her; she thought he was going to arrest her for prostitution. Scott told the officer she was trying to get away from her pimp and needed help. The officer took Scott to her hotel room, where she picked up her possessions. He then took her to a BART station, and she went to a women's shelter.

In January 2013, while Scott was in the shelter, defendant sent her threatening text messages. In particular, defendant urged Scott to give him the laptop she purchased. One message said, "All I want to do is get that laptop so I can post these hoes [sic]. I have got to handle my business. I am about to handle business, not for you." Another text said, "Bitch, you have made that cause of where I sent you. Ho, that's my money. Get it straight. You wouldn't have touched none of that without me. So you saying you

3

are not giving me my shit?"  Another message stated, "I am going to kill you. . . . Remember we was pimping and hoeing [sic].  We was playing by that rules.  You not even giving me a chance to show you what a relationship with me is like outside the game. . . .  It wasn't cool that I hit you."

While in the shelter, Scott continued to occasionally engage in prostitution.  Scott eventually called the Oakland Police Department and reported that defendant was a pimp.

The People's Other Evidence

Oakland Police Sergeant Holly Joshi testified she received a call on December 28, 2012 from Scott, who reported she had recently escaped from her pimp and was staying at a homeless shelter.  Scott sounded afraid and nervous.  A few days later, Sergeant Joshi interviewed Scott at the shelter and noticed she had redness, swelling, and slight bruising to her right eye.

On January 25, 2013, defendant was arrested at a motel in the presence of a prostitute identified as D.J.  At trial, D.J. (who was 17 years old), testified she did not consider defendant to be her pimp, but he paid her expenses and she gave him the money she was earning as a prostitute.  Text messages between defendant and D.J. were consistent with a pimp-prostitute relationship.  D.J. was with defendant for about a week before he was arrested.  They did not have sexual contact.  Defendant was nice, never forceful or threatening.  She told defendant she was 19 years old.

The People presented evidence showing defendant sent a standard text message to numerous prostitutes using an internet prostitution website; the message stated, "Maybe when you ready for a change or something, better hit me.  My name is Dezzle.  Ima keep you truly happy.  Have you make more money than what you making now and Ima treat you the way I supposed to when you wit me.  When you ready for something better and something new, I'm ready to give it to you, baby."  Sergeant Joshi found hundreds of similar text messages sent out by defendant.

Sergeant Joshi also provided expert testimony in the area of human trafficking, pimping, and pandering.  Among other things, she described the pimping and prostitution subculture in Oakland, and the rules regulating the relationships between pimps and their

4

prostitutes. She also explained that certain pimps—a type she described as a "Romeo pimp"—rely on romance and seduction to acquire and retain prostitutes. The prosecutor posed hypothetical questions to Sergeant Joshi based on the facts in the present case, and the officer indicated the circumstances were consistent with a pimp-prostitute relationship.

On cross-examination, defense counsel asked Sergeant Joshi about the legal definition of pimping, and the officer opined there was a difference "between the letter[] of the law and the spirit of the law." Although the law defines pimping as "knowing that someone is working as a prostitute and deriving support or benefit from them, . . . . the spirit of the law, the intent of the law, the way police officers interpret and enforce the law is not to go after a taxi cab driver or the clerk at the grocery store or the guy who is . . . doing her laundry, because he knows she's a prostitute."

DISCUSSION

I.    *Defendant's Claims of Unconstitutional Vagueness Lack Merit*

Defendant contends the section 266h prohibition on pimping is unconstitutionally vague because the phrase "derives support or maintenance in whole or in part" fails to establish standards that are sufficiently definite to guard against the arbitrary deprivation of liberty interests.[2] In particular, he emphasizes that the prosecution's expert, Sergeant Joshi, testified that numerous people violate the "letter of" section 266h, including, for example, cab drivers. Defendant also contends the section 266i prohibition on pandering is unconstitutionally vague because it fails to provide guidance as to when a person has crossed the line between a boyfriend and a panderer.[3] In particular, he points to the

---

[2] Section 266h, subdivision (a), provides in relevant part: "[A]ny person who, knowing another person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of the person's prostitution, or from money loaned or advanced to or charged against that person by any keeper or manager or inmate of a house or other place where prostitution is practiced or allowed, or who solicits or receives compensation for soliciting for the person, is guilty of pimping, a felony, and shall be punishable by imprisonment in the state prison for three, four, or six years."
[3] Section 266i, subdivision (a) provides in relevant part: "[A]ny person who does any of the following is guilty of pandering, a felony, and shall be punishable by imprisonment in

5

California Supreme Court's conclusion in *People v. Zambia* (2011) 51 Cal.4th 965, that "the proscribed activity of encouraging someone 'to become a prostitute,' as set forth in section 266i, subdivision (a)(2), includes encouragement of someone who is already an active prostitute." (*Id.* at p. 981.) Defendant asserts the statute "fails to apprise a young man who was not a pimp who meets and falls in love with a young woman who is working as a prostitute where he crosses the line into committing the crime of 'pandering.' "

"The constitutional interest implicated in questions of statutory vagueness is that no person be deprived of 'life, liberty, or property without due process of law,' as assured by both the federal Constitution (U.S. Const., Amends. V, XIV) and the California Constitution (Cal. Const., art. I, § 7). Under both Constitutions, due process of law in this context requires two elements: a criminal statute must ' "be definite enough to provide (1) a standard of conduct for those whose activities are proscribed and (2) a standard for police enforcement and for ascertainment of guilt." ' " (*Williams v. Garcetti* (1993) 5 Cal.4th 561, 567.) "The starting point of our analysis is 'the strong presumption that legislative enactments "must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears. [Citations.] A statute should be sufficiently certain so that a person may know what is prohibited thereby and what may be done without violating its provisions, but it cannot be held void for uncertainty if any reasonable and practical construction can be given to its language." ' " (*Id.* at p. 568.)

We conclude defendant lacks standing to challenge the constitutionality of sections 266h and 266i on vagueness grounds. This is because " 'a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.' " (*People v. Thomason* (2000) 84 Cal.App.4th 1064, 1070.) That principle applies in the present case, because defendant's " 'conduct clearly falls under

---

the state prison for three, four, or six years: . . . (2) By promises, threats, violence, or by any device or scheme, causes, induces, persuades, or encourages another person to become a prostitute."

6

the statute's purview.' " (*Ibid.*; see *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1095 [if a statute "clearly applies to a criminal defendant's conduct, the defendant may not challenge it on grounds of vagueness"].) With respect to the pimping charge, there is no evidence defendant received financial support from Scott in the manner of a taxi driver, motel operator, or any other hypothetical service provider; instead, the evidence is that defendant received Scott's prostitution proceeds as her pimp. With respect to the pandering charge, there was strong evidence defendant was not merely Scott's boyfriend, including Scott's testimony and the incriminating texts sent by defendant to Scott while she was in the shelter. The evidence of his pimping and pandering of others following Scott's departure was also evidence of his common scheme of obtaining support from active prostitutes. (See Part IV, *post*.)

In his reply brief, defendant emphasizes the jury acquitted him of human trafficking, which required a showing that he "deprive[d] or violate[d] the personal liberty of" Scott. He also points out the jury had some difficulty in reaching verdicts on the pimping and pandering counts: At one point the jury advised the court it was deadlocked on the pimping count; and the jury requested clarification regarding the timing of the conduct underlying the pandering count, in relation to when Scott became a prostitute.[4] Finally, defendant points out there was no evidence he "obtained noticeable financial benefit" from his relationship with Scott, such as lifestyle changes or significant purchases. Based on those circumstances, he argues the evidence against him was not overwhelming and he therefore has standing to challenge the constitutionality of the statutes. However, even if there was a basis for a fact finder to be skeptical of portions of Scott's testimony, defendant presents no basis to conclude the jury convicted defendant based on anything other than a finding of a voluntary pimp-prostitute relationship. Notably, the prosecutor based her argument for conviction on such a relationship; she did

---

[4] The jury asked, "does the procure have to happen at the beginning of the relationship or at any time." The court responded, consistent with *Zambia*, *supra*, 51 Cal.4th 965, "With respect to whether the 'procurement' has to happen at the beginning of the relationship, or at any time during the relationship, my response is this: there is no fixed time for the 'procurement' need to have occurred."

not argue defendant could be convicted of pimping and pandering if he was merely her boyfriend.[5]

In any event, sections 266h and 266i are not unconstitutionally vague. In *People v. Grant* (2011) 195 Cal.App.4th 107, 112, the defendant argued the pimping statute is unconstitutional "because it deprives him of his right of association by prohibiting cohabitation with a known prostitute." Another division of this court rejected that contention, as well as the defendant's contention the statute is "unconstitutionally overbroad because it 'insufficiently specifies the nature of the association it seeks to criminalize. . . .' " (*Id.* at p. 115.) *Grant* held the statute was not vague—that is, it is " 'sufficiently clear to inform persons of ordinary intelligence of the character of the prohibited conduct.' " (*Ibid.*) *Grant* explained the statute did not "preclude a person from accepting a known prostitute's funds gained from the prostitute's lawful activities or for purposes other than the person's support and maintenance." (*Id.* at p. 116.) In particular, a person who receives funds from a known prostitute for a " 'legitimate professional service' " is not within the scope of the statute; " '[i]n such circumstances, even if paid with proceeds earned from prostitution, the [person] derives his support from his own performance of services, and not directly from the prostitute's earnings.' " (*Ibid.*, quoting *Allen v. Stratton* (C.D.Cal. 2006) 428 F.Supp.2d 1064, 1072, fn. 7.) Thus, contrary to defendant's hypotheticals and Sergeant Joshi's testimony, a person legitimately providing taxi services, selling groceries, or renting a hotel room to a known prostitute is not within the scope of section 266h. Because application of the statute is

---

[5] In its brief, respondent challenged defendant's standing on the basis that " 'his conduct clearly falls under the statute's purview,' and 'a person to whom a statute may constitutionally be applied will not be heard to challenge the statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.' " In his reply, defendant never challenged that standard but did seek to show that the evidence did not establish that his conduct clearly fell within the statute. At oral argument, defendant contended that a different standard for standing applied because he had relied on an overbreadth as well as a vagueness challenge to the statutes. Because this argument was raised for the first time at oral argument, we do not consider it. (*Palp, Inc. v. Williamsburg Nat. Ins. Co.* (2011) 200 Cal.App.4th 282, 291, fn. 2.)

8

not unclear in the circumstances hypothesized by defendant, his claim section 266h is unconstitutionally vague fails.[6]

Defendant's claim section 266i is unconstitutionally vague was rejected in *People v. Hashimoto* (1976) 54 Cal.App.3d 862. *Hashimoto* explained that both sections 266h and 266i are "designed to discourage prostitution by discouraging persons other than the prostitute from augmenting and expanding a prostitute's operation, or increasing the supply of available prostitutes." (*Hashimoto*, at p. 867.) The court concluded section 266i is not vague, reasoning "It is not reasonably susceptible of being interpreted to cover any activity beyond that involved in the social evil of pandering. [Citation.] The terms 'procuring, persuading and encouraging' are all words capable of precise definition." (*Ibid.*)[7] Defendant suggests the statute does not provide sufficient guidance regarding what conduct is prohibited when a person is a boyfriend of an active prostitute, but he does not explain why the actual statutory language ("encourage," etc.) is vague. Defendant posits a hypothetical as to whether a motel manager that gave a prostitute a discount, knowing the room's intended use, would be guilty of encouraging prostitution. We need not decide in the present case whether section 266i applies to such conduct, but the possibility it does is not such an overbroad application as to render the statute unconstitutionally vague.

For the reasons stated, defendant's constitutional challenges on the ground of vagueness are without merit.

---

[6] *Grant* did not expressly address whether section 266h is applicable to a bona fide boyfriend of a prostitute who derives unearned support from the prostitute's earnings. Even assuming it does, defendant does not show that would render the statute unconstitutionally vague. In particular, he does not show that the possibility that police might decline to pursue an investigation in such a case, as Sergeant Joshi testified, means the statute provides insufficient guidance or " 'encourage[s] arbitrary or discriminatory enforcement.' " (*People v. Castenada* (2009) 23 Cal.4th 743, 751.)

[7] Although the relatively recent *Zambia* decision held that the pandering statute includes "encouraging a person who is already a prostitute," that holding confirmed a line of cases dating back to 1973. (*Zambia*, *supra*, 51 Cal.4th at p. 972.) That line of cases was followed in *Hashimoto*, *supra*, 54 Cal.App.3d at p. 866, so *Hashimoto's* holding on vagueness was based on an understanding of section 266i consistent with *Zambia*.

II.     *The Trial Court Did Not Abuse Its Discretion in Admitting Expert Testimony*

Defendant contends the trial court abused its discretion in permitting Sergeant Joshi to provide expert testimony regarding prostitution, pimping, and pandering.  The claim fails.

"The requirements for expert testimony are that it relate to a subject sufficiently beyond common experience as to assist the trier of fact and be based on matter that is reasonably relied upon by an expert in forming an opinion on the subject to which his or her testimony relates.  [Citations.]  Such evidence is admissible even though it encompasses the ultimate issue in the case." (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1371.)  "On the other hand, '[e]xpert opinion is not admissible if it consists of inferences and conclusions which can be drawn as easily and intelligently by the trier of fact as by the witness.' " (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506.)  " 'As a general rule, a trial court has wide discretion to admit or exclude expert testimony." (*Ibid.*)  This discretion extends to the trial court's determination " 'as to whether a particular subject is a proper one for expert opinion.' " (*People v. Dejourney* (2011) 192 Cal.App.4th 1091, 1110 (*Dejourney*).)

In admitting Sergeant Joshi's expert testimony, the trial court relied on two federal decisions, *United States v. Taylor* (9th Cir. 2001) 239 F.3d 994 and *United States v. King* (D. Haw. 2010) 703 F.Supp.2d 1063.  In *Taylor*, the government sought admission of expert testimony on prostitution "in particular to explain why a person in [the testifying prostitute's] position might not have testified truthfully in previous proceedings about her relationship with her pimp." (*Taylor*, at p. 998.)  The court approved admission of the testimony, reasoning, "By and large, the relationship between prostitutes and pimps is not the subject of common knowledge.  [Citations.]  A trier of fact who is in the dark about that relationship may be unprepared to assess the veracity of an alleged pimp, prostitute, or other witness testifying about prostitution." (*Ibid.*)  Similarly, in *King*, the court reasoned expert testimony regarding prostitution was "pertinent to jurors' determination of the credibility of the prostitutes . . . .  Without such testimony, jurors might presume that the victims did not want to escape from [the d]efendant's alleged operation because

10

they failed to run away on the occasions when they were beyond his physical grasp. . . . The Court finds that [the expert's] testimony could aid the jury in understanding how these women could be the victims of fraud, force or coercion rather than simply willing participants with free will to exit their situation." (*King*, at p. 1075.)

Defendant contends *Taylor* and *King* are distinguishable because "Scott never minimized [defendant's] conduct . . . . To the contrary, [] Scott freely accused [defendant] of guilt at all times and when he slapped her she became angry with him and left him. She was not a battered woman, and any issues as to her credibility had nothing to do with any reluctance to testify against [defendant] because of 'psychological issues.' " We disagree. Although Scott did not appear to minimize defendant's conduct, she did testify defendant coerced her to continue prostituting herself. The trial court could reasonably conclude Sergeant Joshi's testimony would aid the jury in understanding why Scott did not take opportunities to leave defendant, and why she returned to Oakland from Iowa, after traveling there from Albuquerque. Courts have admitted expert testimony to explain victim behavior in analogous circumstances. (See, e.g., *Dejourney, supra,* 192 Cal.App.4th at p. 1110 ["courts have repeatedly recognized the appropriate use of expert testimony when an alleged victim's actions during or following a crime seem to contradict the victim's claims in cases of alleged molestation or abuse"].)[8] The federal D.C. Circuit engaged in similar analysis in *United States v. Anderson* (D.C. Cir. 1988) 851 F.2d 384. There, the court affirmed admission of expert testimony on prostitution, reasoning the testimony "helped the jury to determine the credibility of the government's prostitute-witnesses, which counsel for [the defendant] had sought to undermine on cross-examination by pointing up the inconsistencies in the witnesses' testimonies, and by intimating that they would not have remained with [the defendant] if he had mistreated them as they claimed." (*Id.* at p. 393.)

---

[8] Although the jury ultimately found defendant not guilty of human trafficking, the prosecution's theory was that Scott was coerced by defendant, so the expert testimony was relevant to that theory.

11

Moreover, the trial court could reasonably conclude Sergeant Joshi's testimony about the rules of the Oakland prostitution subculture would aid the jury in understanding what relationship characteristics—such as strict prohibitions on contact with men who weren't customers—were markers of a pimp-prostitute relationship, as well as why other relationship characteristics—such as romantic behaviors—were *not* inconsistent with a pimp-prostitute relationship. The California Supreme Court has recognized that expert testimony regarding criminal subcultures may be appropriate. (*People v. Gardeley* (1997) 14 Cal.4th 605, 617 [approving expert testimony regarding "the culture and habits of criminal street gangs"].)

Defendant argues the expert testimony was "cumulative" because Scott provided "articulate and thorough" testimony regarding the rules of the Oakland prostitution subculture. However, the prosecution was not obligated to rely on Scott, whose credibility could be questioned, in order to educate the jury about those relevant facts. Defendant also argues aspects of the expert testimony were "irrelevant" because they described circumstances not present in the present case, such as the fact that many pimps have multiple prostitutes working for them. However, defendant fails to show it is "reasonably probable" (*People v. Prieto* (2003) 30 Cal.4th 226, 247) any irrelevant testimony was prejudicial. To the extent that Sergeant Joshi described characteristics and behavior typical of pimps but not manifested by defendant, it arguably was helpful to his case rather than harmful.

Finally, defendant contends Sergeant Joshi "vouched for [defendant's] guilt" by testifying on cross-examination that she doesn't "work cases that don't involve force, fear or coercion." We understand defendant's objection to be that the expert improperly expressed an opinion on his guilt. (*People v. Leonard* (2014) 228 Cal.App.4th 465, 493.) However, because defendant failed to move to strike that testimony, his claim is not cognizable on appeal. (Evid. Code § 353, subd. (a).) Neither did defendant object to Sergeant Joshi's testimony that various factual circumstances in the present case were "consistent with" a pimp-prostitute relationship.

The trial court did not abuse its discretion.

12

III.     *Defendant's* Brady *Claim is Without Merit*

Defendant contends the trial court erred in denying his motion for mistrial based on the prosecution's failure to identify the Oakland police officer who approached Scott while she was working on December 27, 2012, and then ultimately assisted her in getting to a shelter.  Defendant contends the prosecution was obligated to disclose the officer's name under *Brady v. Maryland* (1963) 373 U.S. 83.  We conclude defendant has not shown material evidence was suppressed by the prosecution.[9]

"In *Brady*, the United States Supreme Court held 'that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'  [Citation.]  The high court has since held that the duty to disclose such evidence exists even though there has been no request by the accused [citation], that the duty encompasses impeachment evidence as well as exculpatory evidence [citation], and that the duty extends even to evidence known only to police investigators and not to the prosecutor [citation].  Such evidence is material ' "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." ' "  (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042 (*Salazar*).)  " 'The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.' "  (*In re Brown* (1998) 17 Cal.4th 873, 886.)

On appeal, defendant makes the same argument his counsel made below, that the officer who approached Scott while she was working was "central to [the] defense that the officer may have put Miss Scott in a situation where she had to choose between going to jail or claiming to be [a] victim."  Defendant suggests that, if the officer's identity had

[9] Because we conclude defendant has not made a showing of materiality, it is unnecessary to summarize the elaborate procedural history surrounding the search for the police officer's identity, defense counsel's efforts to obtain disclosure of the name of the officer, and the trial court's reasoning and rulings.

13

been disclosed, the officer's testimony might have undermined Scott's credibility by showing she identified defendant as her pimp only because she was otherwise threatened with arrest. Defendant asserts, "Obviously avoiding jail is a strong incentive, and by accusing [defendant] of being a pimp Miss Scott in effect exchanged her freedom for his. That motivation has a strong impact on the assessment of her credibility."

We recognize that, because defendant never had an opportunity to interview the police officer at issue, it is appropriate to somewhat "relax[] . . . the specificity required in showing materiality." (*United States v. Valenzuela-Bernal* (1982) 458 U.S. 858, 870 (*Valenzuela-Bernal*).) Nevertheless, as the United States Supreme Court explained, "while a defendant who has not had an opportunity to interview a witness may face a difficult task in making a showing of materiality, the task is not an impossible one. In such circumstances it is of course not possible to make any avowal of *how* a witness may testify. But the events to which a witness might testify, and the relevance of those events to the crime charged, may well demonstrate either the presence or absence of the required materiality." (*Id.* at p. 871; see also *United States v. Damra* (6th Cir. 2010) 621 F.3d 474, 487–488.)[10]

Defendant has failed to demonstrate the unidentified police officer's role was so important that failure to identify him constituted a *Brady* violation. At the outset, the evidence does not support defendant's assertion Scott would have been arrested had she not reported defendant. Although Scott testified she thought the officer was going to arrest her when he approached, there is no evidence the officer actually had probable cause to arrest Scott for prostitution. Scott's testimony is that she was searching for shelters on her phone and talking with a possibly drunk "regular" at the time the officer approached her. Without some indication the officer had probable cause to arrest Scott, there is little reason to believe the officer had sufficient leverage to coerce Scott into

---

[10] Although *Valenzuela-Bernal* addressed a claim for denial of the right to compulsory process, the United States Supreme Court analogized the materiality requirement for such a claim to the materiality requirement for *Brady* claims. (*Valenzuela-Bernal*, *supra*, 458 U.S. at pp. 867–868.)

falsely implicating defendant. Even more importantly, there is no evidence to support an inference the officer's decision to help Scott was conditioned on her reporting defendant. The officer did not escort Scott to the shelter, and defendant cites no evidence he followed up with Scott, suggested that another officer follow up with Scott, or filed a report documenting the information he learned from Scott. Neither does defendant cite any evidence suggesting Scott's decision to report defendant to the police was anything but an entirely voluntary decision she made after arriving at the shelter. Thus, even if Scott claimed to be a victim the night of December 27, 2012 in order to avoid arrest, there is no basis to conclude her subsequent report to the police was motivated by a desire to avoid prosecution.

Therefore, contrary to defendant's assertions below and on appeal, there is no indication the unidentified police officer was *directly* connected to Scott's decision to report defendant to the police; without that direct connection, there is insufficient basis to conclude the officer was a material witness within the meaning of *Brady*. Neither has defendant shown there was a reasonable probability (*Salazar*, *supra*, 35 Cal.4th at p. 1042) of a different outcome if the officer's testimony contradicted Scott's description of the events of the night of December 27, 2012, because that was only a small portion of her testimony and because her testimony was corroborated by defendant's texts and other evidence in the case. The trial court did not err in denying defendant's motion for a mistrial on the ground of *Brady* error.

IV.    *The Trial Court Did Not Err in Admitting Evidence of Uncharged Conduct*

Defendant contends the trial court erred in admitting evidence that, after Scott entered a shelter, he tried to recruit prostitutes to work for him on an internet site and acted as a pimp to D.J. The trial court did not abuse its discretion. (*People v. Lewis* (2001) 25 Cal.4th 610, 637 (*Lewis*).)

The introduction of evidence of a defendant's uncharged conduct is governed by Evidence Code section 1101. That statute reads, in relevant part, as follows: "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion,

15

evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, . . . ) other than his or her disposition to commit such an act." (Evid. Code, § 1101.)

The California Supreme Court has "considered specific circumstances under which evidence of uncharged crimes may be admitted under subdivision (b) of Evidence Code section 1101. When the prosecution seeks to prove the defendant's identity as the perpetrator of the charged offense with evidence he had committed uncharged offenses, the admissibility of evidence of the uncharged offenses turns on proof that the charged and uncharged offenses share sufficient distinctive common features to raise an inference of identity. A lesser degree of similarity is required to establish the existence of a common plan or scheme and still less similarity is required to establish intent. [Citations.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to the charged offense to support the inference that the defendant probably acted with the same intent in each instance." (*People v. Lindberg* (2008) 45 Cal.4th 1, 23.) Regardless of the theory of admissibility, "evidence of uncharged misconduct ' "is so prejudicial that its admission requires extremely careful analysis" ' " and " '[t]he probative value of the uncharged offense evidence must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*Lewis*, *supra*, 25 Cal.4th at p. 637.)

Although courts often group the theories together, the three theories of admissibility differ in "subtle but significant" ways. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 394, fn. 2 (*Ewoldt*).) Under the identity theory, the evidence is admitted not to show that a crime was committed, but that the defendant was the one that committed the crime. (*Ibid.* ["Evidence of *identity* is admissible where it is conceded or assumed that the

16

charged offense was committed by someone, in order to prove that the defendant was the perpetrator."].)  Under the intent theory, the evidence is admitted to show the defendant's intent, where intent remains an issue even assuming the defendant committed the alleged conduct.  (*Ewoldt*, *supra*, 7 Cal.4th at p. 406 ["[e]vidence of intent is relevant to establish that, assuming the defendant committed the alleged conduct, he or she harbored the requisite intent"].)  Finally, under the common plan theory, the evidence is admitted to support an inference that criminal conduct occurred, where the defendant disputes the alleged conduct occurred at all.  (*Id.* at p. 394 ["Evidence of a common design or plan . . . is not used to prove the defendant's intent or identity but rather to prove that the defendant engaged in the conduct alleged to constitute the charged offense."].)

In the present case, defendant objected to the evidence of his involvement with D.J. and his attempts to recruit other prostitutes, and the trial court found the evidence was admissible to prove defendant's intent and to show a common plan and was not subject to exclusion under section 352 of the Evidence Code.  We conclude the trial court did not abuse its discretion in concluding the evidence was admissible to show a common plan.  Defendant's identity was not at issue, and, if defendant engaged in the conduct described by Scott, "his intent in doing so could not reasonably be disputed."  (*Ewoldt*, *supra*, 7 Cal.4th at p. 406; see *People v. Lopez* (2011) 198 Cal.App.4th 698, 715 [under section 352 of the Evidence Code, "evidence of uncharged acts cannot be used to prove something that other evidence showed was beyond dispute; the prejudicial effect of the evidence of the uncharged acts outweighs its probative value to prove intent as it is cumulative regarding that issue"].)  On the other hand, as explained below, the evidence of uncharged conduct showed a common plan that corroborated Scott's testimony that defendant encouraged her to engage in prostitution and received the proceeds of her prostitution.

"To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual. . . .  [E]vidence that the defendant has committed uncharged criminal acts that are similar to the charged offense

may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts." (*Ewoldt*, *supra*, 7 Cal.4th at p. 403.) The evidence that defendant was D.J.'s pimp and attempted to recruit numerous other prostitutes showed defendant's common plan of obtaining personal financial benefit through establishing relationships with current prostitutes. That evidence of a common plan, in turn, supported an inference that defendant established a similar relationship with Scott, and that his relationship with her was not merely that of a boyfriend. (*Id.* at p. 393 [" 'The presence of a design or plan to do or not to do a given act has probative value to show that the act was in fact done or not done.' "].) Although defendant's common plan is not "distinctive or unusual," his uncharged acts of pimping and pandering "demonstrate circumstantially that" he employed a similar plan in his relationship with Scott. (*Id.* at p. 403.)

Defendant also argues in passing that the trial court erred in failing to exclude the evidence under Evidence Code section 352 because there was a danger the jury would convict defendant for his conduct in relation to D.J. and for his efforts to recruit other prostitutes. Although that is a factor weighing against admission of the evidence (*Ewoldt*, *supra*, 7 Cal.4th at p. 405), the trial court did not abuse its discretion. The evidence of defendant's uncharged conduct had high probative value due to its temporal proximity to the charged offenses and the circumstance that the sources of the evidence of the uncharged conduct were independent from the source of the evidence of the charged offense. (*Id.* at pp. 404–405; *People v. Balcom* (1994) 7 Cal.4th 414, 427.) Moreover, the uncharged conduct was not more inflammatory than the charged conduct, as the charged conduct included allegations of violence and coercion. (*Ewoldt*, at p. 405; *People v. Sullivan* (2007) 151 Cal.App.4th 524, 559.)[11] In light of the passing nature of defendant's argument on the point, the trial court's ruling under Evidence Code section 352 requires no further discussion.

---

[11] It is true that D.J. was a minor when she was with defendant, but she testified she told defendant she was 19 and defendant was always nice to her. On balance, the allegations regarding D.J. were not more inflammatory.

18

The trial court did not abuse its discretion in admitting evidence of defendant's uncharged conduct relating to pimping and prostitution.

DISPOSITION

The judgment is affirmed.

_____

SIMONS, Acting P.J.

We concur.

_____

NEEDHAM, J.

_____

BRUINIERS, J.