Filed 5/24/16  P. v. Lowary CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D068115 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN323060) |
| KENNY ALLEN LOWARY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Richard R. Monroy, Judge.  Affirmed as modified and remanded with directions.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Michael P. Pulos and Elizabeth M. Carino, Deputy Attorneys General, for Plaintiff and Respondent.

In October 2013 Kenny Allen Lowary was charged in an information with first degree residential burglary (count 1: Pen. Code,[1] §§ 459, 460), resisting an executive officer (count 2: § 69), and misdemeanor resisting an officer (count 3: § 148, subd. (a)(l)). The information alleged Lowary committed counts 1 and 2 while released from custody on bail (§ 12022.1, subd. (b)). The information also alleged Lowary had suffered two strike priors within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12), two serious felony priors (§ 667, subd. (a)(l)), and two prison priors (§ 667.5, subd. (b)).

In September 2014 at the first trial, a jury found Lowary guilty of count 3 (misdemeanor resisting an officer) and not guilty of count 2 (resisting an executive officer). The jury was hopelessly deadlocked on count 1 (first degree residential burglary), and the court declared a mistrial as to that count.

In March 2015 following a retrial, a jury found Lowary guilty of the first degree residential burglary charged in count 1. The court found to be true the allegations that Lowary had suffered two strike priors, two serious felony priors, and two prison priors, and that he had committed count 1 while released from custody on bail (§ 12022.1, subd. (b)).

At sentencing, the court dismissed its true finding that Lowary committed the burglary while released from custody on bail and also dismissed one of the two strike priors. The court then sentenced Lowary to a total prison term of 24 years, which

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

consisted of the upper term of six years for his count 1 burglary conviction, doubled to 12 years under the Three Strikes law as a result of the strike prior, plus 5 years for each of the two serious felony priors, and one additional year for each of the two prison priors. The court also sentenced Lowary to 364 days in local custody for his count 3 misdemeanor conviction of resisting an officer (§ 148, subd. (a)(l)), with credit for time served.

Lowary appeals, contending the court prejudicially abused its discretion and violated his federal constitutional right to present a defense by precluding defense counsel from (1) referring to the first trial as a "trial" rather than as a "prior hearing," (2) cross-examining Officer West—who was on board the ASTREA helicopter on the day of the burglary and testified he observed a White male jump from the upstairs window of Russo's house—about his knowledge of Lowary's prior requests for information relating to the helicopter, and (3) mentioning the outcome of the first trial during her closing argument. He also contends the court committed sentencing error by imposing both a five-year prior serious felony conviction enhancement under section 667, subdivision (a), and a one-year prison prior enhancement under section 667.5, subdivision (b), based on the same 2001 residential burglary conviction.

We modify the judgment by striking the one-year prison prior enhancement, affirm the judgment as modified, and remand the matter with directions to amend the abstract of judgment.

FACTUAL BACKGROUND

A. *The People's Case*

1. *The burglary*

Lillian McKendry testified that in the afternoon on August 29, 2013, a man knocked on the back door of her house in Carlsbad. McKendry testified that the man had tattoos and was wearing an orange safety vest, a white T-shirt, khaki shorts, construction work boots, dark glasses, and a hat. While shielding his face with a clipboard, the man asked whether McKendry had ordered landscaping services. When McKendry said no, the man left without leaving his name or business card.

A few minutes later, a man knocked on the side door of the home of McKendry's neighbor Cheyanne Blackburn, who testified that the man asked whether she needed landscaping services. When she said no, the man left without giving his name or telling her what company he worked for or leaving a business card.

Another resident, Paul Peters, saw a man peeking over a neighbor's fence at 4009 Crescent Point and checking the locks on the gates. Peters testified that the man was wearing a blue baseball hat, a green and orange safety vest, a bluish or gray T-shirt, denim shorts, and tan work boots. It appeared the man was trying to climb over the fence, so Peters called 911.

Officers from the Carlsbad Police Department responded to Peters's 911 call and arrived at 4009 Crescent Point. Officer Anthony Jucenas was checking the outer perimeter of 4009 Crescent Point when he heard what he thought was a door slamming next door at 4011 Crescent Point. Officer Jucenas and another officer checked the

4

perimeter around that house, pulled on both gates which would not open, and found that the front door was locked.

Minutes later, Marlene Russo, who was living at 4011 Crescent Point, pulled into her driveway. Officer Jucenas asked Russo if anyone was supposed to be in her backyard and she said no. Officer Jucenas testified that, with Russo's permission, he entered the backyard through a gate. Officer Jucenas noticed that a screen that had been cut was on the ground leaning against the kitchen window.[2] He immediately thought someone had gained entry into the house.

Officer Jucenas then noticed that the closed vertical blinds inside the sliding glass door next to the kitchen window were moving. Officer Jucenas testified that, as he was watching the blinds, someone pulled the blinds all the way open. Officer Jucenas saw that the person was a white male wearing a blue shirt, a blue hat, khaki shorts, tan construction boots, and black knit gloves.

Officer Jucenas then returned to the front of the house and instructed Russo to stand across the street because there was someone in her house. The officers set up a perimeter around Russo's home and called Aerial Support to Regional Enforcement Agencies (ASTREA) for backup.

Tactical Flight Officer John West and his partner, who had received a description of the suspect as a White male wearing a hat and gloves, arrived over the scene in an ASTREA helicopter. As Officer Jucenas and a team of officers were about to enter

---

[2] Russo testified that two screens were missing from the windows of her house: the kitchen window screen and an upstairs bedroom window screen.

Russo's house through the front door, Officer West─using electronically stabilized binoculars in the helicopter above the house, which he testified allowed him to "zoom in real close"─saw a White male jump down from a second story window onto a wooden pergola. The man jumped down from the pergola to the ground, and then he jumped over a fence and ran toward the street. Officer West radioed this information to the officers on the ground.

One of the officers on the ground─Officer James Bellamy, who had watched the man jump down from the pergola─yelled at the man, "Stop. Police. Get on the ground." The man did not respond. Instead, he opened the side gate and went toward the yard in the front of the house. There he was met by several officers, including Officer Jucenas, who had drawn their guns.

Officer Jucenas testified that he ordered the man, whom he identified at trial as Lowary, to get down on the ground, but he did not comply. When Lowary began approaching one of the female officers, Officer Jucenas tackled him to the ground, and the two began to struggle. Officer Jucenas testified that Lowary tried to punch him and kicked his legs at him.

For officer safety, Officer Bellamy deployed his police dog, and the canine grabbed Lowary by the chest. When the dog released its bite, the officers handcuffed Lowary.

6

At the time of his arrest, Lowary was wearing a white "Jazzercise" T-shirt that belonged to Russo,[3] khaki shorts, and tan construction boots. At the scene, McKendry and Peters identified Lowary as the man they had seen earlier that day.

2. *Investigation*

Officer Jucenas searched Lowary for weapons a few minutes after he was handcuffed. Inside Lowary's pockets, Officer Jucenas found cash, sunglasses, a measuring tape, and a keychain belonging to Russo. After Officer Jucenas took a photo of the keychain, he returned it to Russo. Lowary was then transported to the hospital in an ambulance for treatment of the dog bite.

During the investigation, Officer Jucenas found a safety vest and one black knitted glove on the ground underneath the pergola. He also noticed that a chair had been propped up against one of the pergola's support beams and that a bedroom window above the pergola was missing a screen. Officer Jucenas found the other black glove in the upstairs bedroom with the missing window screen. During an inventory search of Lowary's vehicle, officers found a pair of bolt cutters but no landscaping or painting tools. Lowary's blue hat and blue T-shirt were never found.

Russo testified that all of the bedrooms in her home were very messy and "[e]verything was pulled out." The file cabinets insideher closet had been opened and her property strewn across the floor. One of Russo's jewelry boxes had been broken.

---

3       At trial the prosecutor showed Russo a photograph of Lowary, at the time of his arrest, wearing a white T-shirt with the word "Jazzercise" on it. Russo testified she recognized the T-shirt as one of the Jazzercise T-shirts she kept in a plastic bag "in the bedroom where the screen was missing."

During his hospital stay, Lowary was under constant police supervision and one of his hands was cuffed to the bed. The officers supervising Lowary did not search him or his bed.

Lowary was discharged from the hospital and booked into jail during the early morning hours of August 30, 2013. Officer Jucenas testified that he did not go to the hospital where Lowary was taken after he was transported there from Russo's home.

The hospital janitorial crew found two gold watches and a scarf keeper[4] on the bed inside Lowary's hospital room and they turned those items over to a nurse. The nurse thereafter contacted the police, and an officer collected the items from the hospital. Later that day, Russo identified the watches as her property. Officer Jucenas took photographs of the items and returned them to Russo.

3. *DNA evidence*

On September 29, 2014, DNA sample swabs were taken from Lowary's mouth and submitted for testing. The safety vest and the pair of black knitted gloves found at the scene were also tested. However, the DNA profile obtained from the safety vest was not suitable for comparison.

To identify the person who wore the gloves, the DNA analyst swabbed the inside of each glove. The first glove contained a mixture of DNA from at least two people, and Lowary was the major DNA contributor. According to the DNA analyst, the probability

---

[4] At trial, the scarf keeper was also referred to as a key chain.

8

of selecting a person at random that is included as a possible contributor to the major DNA profile is approximately one in 100 quadrillion.

The second glove contained a mixture of DNA from at least three people. The partial major DNA profile obtained matched Lowary's DNA, and the probability of selecting a person at random as a possible contributor is approximately one in 530 billion.

B. *Defense Case*

Stacy Arena, a licensed handyman contractor, testified that in 2011 he taught Lowary the trade and introduced him to some customers to get him some work. When business became slow, Arena was no longer able to give Lowary work. On cross-examination, Arena testified that he used business cards, and he trained Lowary to introduce himself and the company he works for by name when soliciting work from potential customers.

Lowary testified he was a handyman, and he had installed sprinkler systems, mowed lawns, removed garbage, and done painting. After he stopped working with Arena, he began soliciting construction, landscaping and general handyman jobs by going door-to-door in residential neighborhoods.

Lowary also testified that on August 26, 2013, he was soliciting work by driving around a Carlsbad neighborhood with his young son. When Lowary saw Russo in her driveway at 4011 Crescent Point, he instructed his son to ask whether she wanted to get her house painted. Russo gave Lowary permission to stop by later in the week to do measurements and give her a quote. Lowary did not indicate what specific day he would return.

Lowary testified he returned to Russo's neighborhood on August 29, 2013. He was wearing work boots, gray shorts, a hat, sunglasses, a vest, and a white T-shirt that said "Jazzercise" on it. He also testified that his wife gave him the Jazzercise T-shirt, and he had not mentioned this shirt at any of the previous hearings in this case because he "didn't think it was relevant."

That day, Lowary brought a purple folder with Russo's information and a tape measure with him but he did not bring a ladder or any painting tools. He did not have an appointment with Russo. Lowary testified that because he "was kind of early to meet Ms. Russo," he "kind of cruised around the neighborhood knocking on doors, looking in people's yards and seeing if there was anything [he] could possibly do."

Lowary also testified that he went to Russo's house that day, but she was not home. Instead of waiting for her to come home or returning at a later time, he entered Russo's backyard through the unlocked gate and began measuring the house. He did not have a ladder, so he used a chair to gain access to the pergola[5] in order to measure that part of the house. He placed his vest and hat on the kitchen window sill. When Lowary climbed up onto the pergola, it began to wobble because the wooden slats were old, so he walked along a thick piece of wood along the side of Russo's house. As he was walking toward the corner of the house, he lost his balance and fell forward against the upstairs window, "hit[ting] the window with [his] hands" as he grabbed for the ledge at the bottom of the window. As he fell backwards and started to sit down on the wooden

---

[5]     Lowary referred to the wooden pergola as a "trellis."

10

structure, Lowary looked up and saw the window screen falling down over his head. The screen went over his head, fell vertically straight down through the pergola slats, and landed against the wall below the kitchen window.

Lowary testified that, as he was sitting there on top of the pergola, he heard "like a walkie-talkie from like a police radio" and he "knew the sound." He explained that he "[knew] what the cops' radio sounds like" because he "[had] been in trouble with the law before." He admitted he had been convicted of residential burglaries he committed in 1997 and 1999.

Lowary then looked down through the pergola and saw Officer Jucenas enter Russo's backyard with his gun drawn. Lowary "just kind of froze" because he was scared. He also heard the helicopter and, after sitting there "for a minute listening to what was going on," he decided to confront the situation and tell the police why he was there. Lowary jumped down from the pergola and, when he went he out through the gate, multiple officers yelled orders at him with their guns drawn.

Lowary testified that he did not move toward Officer Chase, a female officer. He also testified that he did not fight back when Officer Jucenas tackled him to the ground. The police dog then bit Lowary in the chest. After the dog released him, Lowary was handcuffed, patted down for weapons, and then searched. Lowary testified that Officer Jucenas searched him again before he was taken to the hospital. He did not have two watches and a scarf holder on his person when Officer Jucenas searched him.

Lowary testified he never was inside Russo's home. He did not know what happened to his purple folder. He did not own black knitted gloves and he was not

11

wearing gloves on the date of the charged offense.  He was surprised to learn that his DNA was found on gloves that he had never touched.

Lowary also testified that while he was at the hospital, he did not change his clothes and an officer sat in his hospital room "the whole time."  Larry never saw any watches or key chains in his hospital bed.

## DISCUSSION

### I.  *EVIDENTIARY AND DEFENSE CROSS-EXAMINATION RULINGS*

Lowary contends the court prejudicially abused its discretion and violated his federal constitutional right to present a defense by precluding defense counsel from (1) referring to the first trial as a "trial" rather than as a "prior hearing," (2) cross-examining Officer West─who was on board the ASTREA helicopter on the day of the burglary and testified he observed a White male jump from the upstairs window of Russo's house─about his knowledge of Lowary's prior requests for information relating to the helicopter, and (3) mentioning the outcome of the first trial during her closing argument. We reject these contentions.

### A.  *Background*

On September 18, 2014, the jury in Lowary's first trial deadlocked on the residential burglary charge, and the court declared a mistrial on that count. A few days later on September 22, Lowary, while representing himself, requested the appointment of a DNA expert to "analyze and compare [his] DNA with [the black knitted gloves]," asserting that the prosecution's evidence was "fabricated."

12

The prosecutor thereafter obtained a report prepared on September 28, 2014, by Officer West, the tactical flight officer who was on board the ASTREA helicopter on the day of the burglary, August 29, 2013. The prosecutor also obtained evidence in the form of DNA testing of a swab taken from Lowary on September 29, 2014.

About five months later, in early March 2015, Lowary was retried on the burglary charge. During a pretrial hearing, defense counsel requested that the first trial be referred to as a "trial" rather than a "prior hearing," stating:

> "First of all, there has been a lot of new evidence that has come since the first trial, and I think it is particularly relevant to our argument that this evidence has all of a sudden manifested itself after the People's failure to get a conviction in the initial trial. And I think that is ripe for cross and ripe for impeachment, and so I don't think saying a *prior hearing* does it justice. [¶] A prior hearing could be anything. I think that the full weight of what this new information means has to be referenced in calling it a *prior trial*." (Italics added.)

The prosecutor opposed the defense's in limine request, arguing:

> "I think a *prior hearing* is appropriate. I think it still covers that there was a hearing where evidence was presented and there was testimony made under oath, and there can be cross-examination on that just the same. [¶] I think *the only purpose to say that it was a prior trial is to let this jury know there was a mistrial*, and there is no other option. [¶] I mean, why would we be in a trial again except for a mistrial? *I don't think the jury should start to speculate or wonder, 'Well, why was there a mistrial*?' I think it is not a safe way to go forward." (Italics added.)

In reply, defense counsel argued:

> "But I think the jury has an absolute right to know that the People of the State of California presented a trial and presented certain evidence, and then after not gaining a conviction in that trial, has since [obtained] DNA evidence and a miraculous police report by a helicopter pilot over a year later, after [Lowary] had

13

requested information from the district attorney multiple times, and I don't think a *prior hearing* gets it across. It has to be it was a *prior trial*. I don't think the full impact and force of what is now before us comes across." (Italics added.)

The court disagreed with defense counsel and ruled that "any reference to the prior hearing will be in fact just that, a *prior hearing*." (Italics added.) The court reiterated, "[W]e will be referring to the *prior trial* as a *prior hearing*." (Italics added.)

At trial (as discussed, *ante*, in the factual background), Officer West testified that, while using electronically stabilized binoculars in the helicopter above a house identified as Russo's house on August 29, 2013, he saw a White male jump down from a second story window onto a wooden pergola. Officer West also testified that the man jumped down from the pergola to the ground, jumped over a fence, and ran toward the street.

Defense counsel cross-examined Officer West about the timing of his report and the prosecution's request that he prepare it, and asked him whether he was aware that Lowary had made multiple requests "for any information relating to the ASTREA helicopter":

"[Defense Counsel]: Officer, are you aware that this case has been going on since August 29th of 2013?

"[Officer West]: Yes.

"[Defense Counsel]: And to your knowledge, this case has been through multiple hearings, correct?

"[Officer West]: Correct.

"[Defense Counsel]: And the most recent hearing was September 15th, 2014; is that correct?

"[Prosecutor]: Objection, Your Honor. Relevance.

14

"[The Court]:  Overruled.  If you know the approximate date.

"[Officer West]:  I don't.

"[Defense Counsel]:  Okay.  You wrote a report in this case; is that right?

"[Officer West]:  Yes.

"[Defense Counsel]:  *And when did you write that report*?  [¶] . . .

"[Officer West]:  *September 28th, 2014*.

"[Defense Counsel]:  Okay.  *When did the incident occur*?

"[Officer West]:  *It was August 2013*.

"[Defense Counsel]:  Okay.  *So you didn't write this report until over a year later*?

"[Officer West]:  *Correct*.

"[Defense Counsel]:  Okay.  Now, there was no video, right?

"[Officer West]:  Correct.  [¶] . . .

"[Defense Counsel]:  *What prompted you to write this report*?

"[Officer West]:  *I was asked to write it by the district attorney*.

"[Defense Counsel]:  Did she tell you why she needed it now?

"[Officer West]:  I believe there was going to be more court hearings and—yeah.  *She just needed it for the hearings coming up*.

"[Defense Counsel]:  *Had anyone ever requested that you provide a report prior to that*?

"[Officer West]:  *No*.  Typically, I don't write reports on every call we go to.

15

"[Defense Counsel]:  Okay.  *Were you aware that . . . multiple requests had been made from* [*Lowary*] *for any information relating to the ASTREA helicopter*?"  (Italics added.)

The prosecutor objected:  "Your Honor, objection.  Relevance and a sidebar."

During the sidebar conference, defense counsel argued that the information was relevant to Officer West's credibility, and it also showed the defense made multiple discovery requests for reports, logs and video from the helicopter and was told that such discovery did not exist.

The court disagreed and sustained the prosecutor's objection.  Noting that it had a copy of Lowary's discovery motion requesting any information regarding the ASTREA helicopter, the court stated, "[b]ut this, with the witness on the stand in front of the jury, this isn't that kind of hearing."  The court then sustained the prosecutor's objection, finding that Officer West's knowledge of Lowary's prior request for ASTREA helicopter discovery was irrelevant:

> "I think I will allow you to ask him a question about when [Officer West] created the report, who asked him to create the report, but *I don't think it is relevant for this officer to testify if he is aware or not aware of prior requests from* [*Lowary*]."  (Italics added.)

Prior to closing arguments and outside the presence of the jury, the prosecutor moved to preclude any defense closing argument regarding the outcome of the first trial, arguing:

> "I remember in the defense opening there [were] some statements made to the jury, it was only after unfavorable outcomes for the government that this new evidence came forward, the DNA and the testimony from John West from ASTREA.  And although I understand that in closing we can discuss *prior hearings*, because the jury does know there have been prior hearings in this matter, I don't

16

think that any outcomes from those prior hearings are relevant, and that shouldn't be something to argue in closing. There has been no evidence of that." (Italics added.)

Defense counsel responded by arguing that the fact the prosecution sought the new DNA and helicopter evidence only "after things didn't go their way," went to the weight and reliability of that evidence:

"I absolutely think it is relevant. [¶] This case was open for more than a year. There was a *previous trial* in this case, which I have been restricted to calling a *previous hearing*, and I think that all of a sudden . . . the most prejudicial evidence only comes after that hearing. And that goes to the weight, obviously, the weight that the jury can take in considering how valuable that evidence is and how reliable that evidence is, and I think it is important to say that they only went and sought this evidence after things didn't go their way." (Italics added.)

The trial court precluded any reference to a prior outcome as irrelevant, explaining:

"[W]hat I will restrict you from [arguing] is any reference to a prior outcome. You can certainly argue the length of time that it took to get this information, the delay between arrest date and a DNA test. *You can refer to prior hearings but not the outcome of those hearings*." (Italics added.)

During her closing argument, defense counsel highlighted the substantial delay between the charged burglary offense and the DNA testing, stating, "This glove wasn't tested for a year and change later, after previous hearings in this case."

In attacking the credibility of Officer West, defense counsel argued:

"He has not testified at any previous hearing. He was contacted by the district attorney's office after a hearing on September 15th, 2014, a year and change later, and a report . . . is generated on September 28th, 2014. It is amazing.

17

"So an officer who didn't write a report that day, who didn't have any video with which to reference, now all of a sudden is able to generate a full-on report and come here before you people and testify. [¶] . . . [¶] There was no report written until literally September 28th, 2014, after a request made by the district attorney's office. But he is confident that he saw [Lowary] come out the window. Okay. You get to evaluate the credibility of the evidence. You get to evaluate whether or not this makes sense."

Defense counsel ended her closing argument by challenging the reliability of the prosecution's newly obtained evidence:

"Why was the DNA not taken until October 7th, 2014? Why did Officer West not write a report until after talking to the [district attorney's] office? Why was that report not generated until September 28th, 2014? If this is the officer, if this is the guy that saw [Lowary] come out the window, because we know no one else saw him come out of the window, how is it possible he never wrote a report, and he never testified at any previous hearing, and that he only generated said report at the request of the District Attorney's office after the September 15th hearing? He has no video to go by. [Fifteen] calls a day, 365 days a year, and now he is positive he saw [Lowary] come out the window."

B. *Applicable Legal Principles*

"'A trial court has inherent as well as statutory discretion to control the proceedings to ensure the efficacious administration of justice.'" (*People v. Gonzalez* (2006) 38 Cal.4th 932, 951.) Section 1044 provides:

"It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved."

"In exercising its discretion under section 1044, a trial court must be impartial and must assure that a defendant is afforded a fair trial." (*People v. Cline* (1998) 60

18

Cal.App.4th 1327, 1334.) "When there is no patent abuse of discretion, a trial court's determinations under section 1044 must be upheld on appeal." (*Ibid*.)

All relevant evidence is admissible except as otherwise provided by law. (Evid. Code, § 351.) "Relevant evidence" is defined in Evidence Code section 210 as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." Evidence is relevant if it tends """"logically, naturally, and by reasonable inference"""" to establish a material fact. (*People v. Hamilton* (2009) 45 Cal.4th 863, 913.) A trial court may exclude relevant evidence where its "probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

A trial court's decision to admit or exclude evidence is reviewed on appeal for abuse of discretion and will not be disturbed "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

A trial court has statutory authority to "exercise reasonable control over the mode of interrogation of a witness so as to make interrogation as rapid, as distinct, and as effective for the ascertainment of the truth, as may be, and to protect the witness from undue harassment or embarrassment." (Evid. Code, § 765, subd. (a).) The trial court has broad discretion under Evidence Code section 765 in exercising control over the interrogation of witnesses. (*People v. Tafoya* (2007) 42 Cal.4th 147, 175 (*Tafoya*).) On

19

appeal, we apply the abuse of discretion standard in reviewing a trial court's exercise of its authority under Evidence Code section 765. (*Tafoya*, at p. 175.)

C. *Analysis*

Following the September 2014 mistrial on the burglary count, as Lowary points out, the prosecution developed incriminating evidence—which it presented at retrial—in the form of (1) DNA evidence linking Lowary to the black knitted gloves found at the crime scene, and (2) Officer West's testimony that he observed from the ASTREA helicopter a White male (Lowary) jump from the upstairs window of Russo's house.

As noted, Lowary contends the judgment should be reversed because the court erroneously precluded defense counsel from (1) referring to the first trial as a "trial" rather than as a "prior hearing," (2) cross-examining Officer West about his knowledge of Lowary's prior requests for ASTREA helicopter discovery, and (3) mentioning the outcome of the first trial (a mistrial) during her closing argument.

In support of these contentions, Lowary asserts his defense at trial was "that he was a legitimate handyman who did not enter [Russo's] home or have any intent to commit theft, but that the authorities may have fabricated or planted evidence to suggest otherwise." He complains that "the jury never heard that the highly inculpatory [new] evidence was obtained only after the first trial resulted in a hung jury[, nor] did the jury hear that [he] also had requested testing of the black gloves as well as any information or report from the helicopter." "In other words," Lowary maintains, "the timing of [the new] evidence in relation to the mistrial was highly relevant because it supported an inference that the evidence had been fabricated to bolster the prosecution's case." The court's

rulings "completely deprived [him] of support for his theory that the authorities had obtained false testimony and evidence when faced with retrying the case."

We reject Lowary's contentions. First, we conclude the court did not abuse its discretion or violate Lowary's constitutional right to present a defense by ruling in limine that the parties must refer to the first trial as a "prior hearing" and not as a "trial." The court implicitly and correctly agreed with the prosecutor's argument that, by referring to the first trial as a prior hearing, the defense still was able to convey to the jury that there had been a prior hearing at which evidence was presented and testimony was given under oath; and Lowary was still able to challenge the reliability of the newly obtained evidence by attacking the credibility of Officer West and the witnesses called by the prosecution to present the DNA evidence on cross-examination. As the prosecutor also correctly asserted during the hearing, the only purpose defense counsel's referring to the first trial as a trial would serve would be to inform the jury that there had been a mistrial in this case, leaving the jury to "speculate or wonder, 'Well, why was there a mistrial?'" Such information would have "create[d] substantial danger . . . of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Here, there was no abuse of discretion. Regarding Lowary's constitutional claim, the California Supreme Court has explained that, "'[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense.'" (*People v. Blacksher* (2011) 52 Cal.4th 769, 821.) Lowary's constitutional claim is unavailing.

Second, we conclude the court did not abuse its discretion or violate Lowary's constitutional right to present a defense by precluding defense counsel from asking

21

Officer West on cross-examination whether he was aware that Lowary had made "multiple requests" for ASTREA helicopter discovery. As she acknowledged during the sidebar conference on the prosecutor's relevance objection, defense counsel attempted to elicit this information from Officer West in an attempt to impeach him and establish an inference that the newly obtained helicopter discovery was fabricated because it had "suddenly become generated and now magically appear[ed]" following the mistrial. Although the court sustained the prosecution's objection, finding that Officer West's knowledge of *Lowary's* prior request for ASTREA helicopter discovery was irrelevant, the court told defense counsel she could ask Officer West when he created his report and who asked him to create it. Also, when defense then asked whether she could ask Officer West if anyone had requested this discovery from him (Officer West) "before he was asked after the September 15th date,"[6] the court replied, "Yes, you can ask that question." On this record, we conclude the court reasonably exercised its broad discretion under Evidence Code section 765 in exercising control over the interrogation of witnesses, and it did not abuse its discretion in limiting defense counsel's cross-examination questions to relevant matters. (See *Tafoya*, *supra*, 42 Cal.4th at p. 175.)

Third, we conclude the court did not abuse its discretion or violate Lowary's constitutional right to present a defense by precluding defense counsel from mentioning the outcome of the first trial—a mistrial—during her closing argument. The court told

---

6    It appears that defense counsel's reference to "the September 15th date" is a reference to the date the court declared the mistrial, September 18, 2014.

defense counsel, "You can refer to prior hearings but not the outcome of those hearings."

The court explained:

> "The outcome of those hearings is not relevant for this jury to weigh into. They can talk. They can say, why did it take so long? That should cast doubt. Arguments like those are permissible from you, because that goes to the credibility . . . of the People's case, but outcome argument is not permissible; so I will restrict you from those references."

A trial court in a criminal case "'must be and is given great latitude in . . . limiting the scope of closing summations.'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1184.)

Here, closing defense argument on the outcome of the first trial, which ended with a mistrial on the burglary count, would have been both irrelevant and improper. "It is axiomatic that counsel may not state or assume facts in argument that are not in evidence." (*People v. Stankewitz* (1990) 51 Cal.3d 72, 102.) In this case, as the prosecutor correctly argued, no evidence regarding the outcome of the first trial had been presented and, thus, any argument by defense counsel on that issue would be improper. The court's limitation on defense counsel's closing argument was well within the court's broad discretion.

## II. *SENTENCING ERROR*

Lowary also contends the court committed sentencing error by imposing both a five-year prison term enhancement under section 667, subdivision (a) for the true finding on the allegation he had suffered a prior serious felony conviction of residential burglary in 2001 (*People v. Lowary* (Super. Ct. San Diego County, No. SCN107720)), and a one-year prison term enhancement under section 667.5, subdivision (b) for the true finding on

the allegation he had suffered a prison prior based on the same 2001 conviction. He asserts the one-year prison prior enhancement (§ 667.5, subd. (b)) must be stricken and the abstract of judgment must be "modified to so reflect." The Attorney General agrees.

"[W]hen multiple statutory enhancement provisions are available for the same prior offense, one of which is a section 667 enhancement, the greatest enhancement, but only that one, will apply." (*People v. Jones* (1993) 5 Cal.4th 1142, 1150 (*Jones*).) A trial court is not authorized to impose both a one-year prison prior enhancement under section 667.5, subdivision (b), and a five-year prior serious felony enhancement under section 667, subdivision (a), based on a single prior serious felony conviction with a prison term. (*Jones*, at p. 1153.) An unauthorized sentence is subject to correction on appeal. (*People v. Dejourney* (2011) 192 Cal.App.4th 1091, 1094, fn. 3 (*Dejourney*).)

By imposing both the one-year prison prior enhancement and the five-year prior serious felony enhancement based on the same 2001 conviction, the court imposed an unauthorized sentence. (See *Jones*, *supra*, 5 Cal.4th at p. 1153.) Accordingly, we modify the judgment by striking the one-year prison prior enhancement and remand the matter with directions to amend the abstract of judgment accordingly. (*Id*. at pp. 1150, 1153; *Dejourney*, *supra*, 192 Cal.App.4th at p. 1094, fn. 3.)

### DISPOSITION

The judgment is modified to strike the one-year prison prior enhancement. In all other respects, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment reflecting such modification and to forward a certified copy to the Department of Corrections and Rehabilitation.

NARES, J.

WE CONCUR:

HUFFMAN, Acting P. J.

McINTYRE, J.